Ralph W. KEITH, et al.,
Plaintiffs–Appellees,

v.

John A. VOLPE, as Secretary of
Transportation, et al.,
Defendants.

Earl WRIGHT, et al., Plaintiffs/Appellees on Supplemental Complaint, California Department of Housing and Community Development, et al., Intervenors/Appellees on Supplemental Complaint,

v.

CITY OF HAWTHORNE, et al.,
Defendants/Appellants on
Supplemental Complaint.

No. 85–6336.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 8, 1987.

Decided Sept. 19, 1988.

Richard Tervian, Adams, Duque & Hazeline, Los Angeles, Cal., for defendants-appellants.

Bill Lee and Carrie Hempel, Center for Law in the Public Interest, Los Angeles, Cal., for plaintiffs-appellees.

John K. Van de Kamp, Atty. Gen. of State of Cal., Sylvia Cano Hale, Deputy Atty. Gen., Los Angeles, Cal., for intervenors-appellees.

Before SCHROEDER, NELSON and NORRIS, Circuit Judges.

SCHROEDER, Circuit Judge:

## INTRODUCTION

Individuals and groups concerned about the dislocation of people living in the path of a planned freeway in the Los Angeles area filed this action in 1972. They sued various state and federal agencies responsible for the freeway's construction and funding. Their complaint sought injunctive relief to halt construction of the freeway until the agencies made binding assurances that they would comply with state and federal laws designed to protect the environment, assure the availability of replacement housing for displaced residents, and eliminate discrimination against minority and poor persons seeking replacement housing.

After years of litigious skirmishing, the parties in 1981 entered into a consent decree setting forth the defendants' obligations. For purposes relevant to this appeal, those obligations included specific commitments to provide units of replacement housing for low and moderate income households. The district court approved the decree and dissolved the injunction, but retained jurisdiction to ensure that the terms of the agreement were fulfilled. Fulfilling the agreement's terms obviously required the cooperation of the municipalities located in the freeway's path, including the appellant City of Hawthorne. At the time the 1981 decree was entered, Hawthorne was a plaintiff in the action.

The present phase of the litigation began in 1985 when some of the original plaintiffs and other individuals sought injunctive relief against the City of Hawthorne ("City") by means of a "supplemental complaint" in the original proceeding. The City of Hawthorne and its officials had refused approval of certain housing developments. Plaintiffs alleged that this action resulted in unlawful discrimination against minority and low-income persons displaced by the freeway construction. The district court permitted the supplemental complaint, and after conducting evidentiary proceedings, enjoined the City from prohibiting construction of the units. *Keith v. Volpe*, 618 F.Supp. 1132, 1160 (C.D.Cal.1985). It then awarded attorney's fees and costs to the plaintiffs. *Keith v. Volpe*, 644 F.Supp. 1317, 1327 (C.D.Cal.1986).

The City of Hawthorne, Hawthorne's City Council, and five councilmembers

("Hawthorne") appeal. Hawthorne challenges plaintiffs' standing, the district court's evidentiary rulings, the sufficiency of the evidence, and the award of fees and costs.

The most significant legal issue is a threshold procedural one. It is whether the district court erred in permitting the plaintiffs to proceed in 1985 by means of a supplemental complaint in the original proceeding. The appellants maintain that the district court should have denied leave to file the supplemental complaint. The case would then have come before a different judge, one with no prior involvement in the litigation and one not familiar with the events leading to the consent decree. We hold that allowing the supplemental complaint was well within the district court's discretion under Fed.R.Civ.P. 15(d), which is designed to permit expansion of the scope of existing litigation to include events that occur after the filing of the original complaint. We affirm.

## BACKGROUND

This action began on February 16, 1972, when Ralph W. Keith and other individuals living in the path of the proposed Century Freeway, together with the Los Angeles Chapter of the National Association for the Advancement of Colored People (NAACP), the Sierra Club, the Environmental Defense Fund, and the Freeway Fighters filed an environmental and civil rights complaint in district court against various state and federal agencies and officials. The complaint sought injunctive relief to halt construction of the freeway until the defendants complied with state and federal environmental, civil rights, and housing laws to provide replacement housing for displaced residents without discrimination against minority and poor persons. *Keith,* 618 F.Supp. at 1137. The original defendants were the Secretary of the United States Department of Transportation, the Region 7 Administrator of the Federal Highway Administration, the United States Department of Transportation, the Federal Highway Administration, the Division Engineer of the Federal Highway Administration

and United States Department of Transportation, the California Highway Commission, the California Department of Public Works, the Director of the California Department of Public Works, and the California State Highway Engineer. In April 1972, the plaintiffs amended their complaint to include as an additional plaintiff the City of Hawthorne, one of the cities through which the proposed freeway would pass.

On July 7, 1972, the district court issued a preliminary injunction prohibiting further work on the freeway until federal and state officials complied with environmental and relocation assistance statutes. *Keith v. Volpe,* 352 F.Supp. 1324 (C.D.Cal.1972), *aff'd en banc sub nom., Keith v. California Highway Commission,* 506 F.2d 696 (9th Cir.1974), *cert. denied,* 420 U.S. 908, 95 S.Ct. 826, 42 L.Ed.2d 837 (1975).

After years of negotiations, the parties entered into a consent decree, which the district court approved on September 22, 1981. Under paragraphs VI and VIII of the decree, the district court retained jurisdiction to enforce or amend the decree until it entered a judgment of dismissal upon the parties' compliance with the decree's terms. The court then dissolved the preliminary injunction, thus permitting further work on the freeway project pursuant to the decree's provisions. The decree remains in effect.

One of the purposes of the consent decree was "to provide for the housing needs of those living in the area of the proposed path of the freeway." Specifically, the decree required the defendants to provide displacees with 3700 units of replenishment housing under its "Housing Plan." Under the Plan's terms, 55 percent of all replacement units would be affordable to low-income households and 25 percent would be affordable to moderate-income households.

The current phase of the litigation concerns the proposed construction of two housing developments, the Cerise and Kornblum projects, in the City of Hawthorne. These developments would provide approximately 128 rental units. Because the Cerise project has since been aban-

doned and any issue concerning it is moot, we are concerned only with the Kornblum Development, a proposed 96–unit apartment complex.

The California Department of Housing and Community Development (HCD), which the consent decree designated as the agency responsible for the coordination and implementation of the Housing Plan, agreed to fund the Kornblum project pursuant to the consent decree. Kornblum's developer then applied to the Hawthorne Planning Department for a lot split, a zoning change, and a site development permit. The Planning Department recommended approval of the Kornblum Development subject to a covenant imposing a 35 percent ceiling on low-income occupants. After a public hearing, the Planning Commission voted to deny the developer's applications. The developer appealed the Planning Commission's decision to the City Council.

On November 13, 1985, the City Council held a public hearing, during which several local residents voiced their opposition to the Kornblum project. Residents expressed concern that the project would lead to increased crime and traffic, overcrowded schools, and lost taxes for the City. They also expressed opposition to having low-income families reside in their neighborhood. The council voted to deny the applications. It apparently did not discuss suitability or consider any alternatives to the project that would provide housing to poor and minority persons displaced by the freeway. *See* 618 F.Supp. at 1142.

On February 7, 1985, Keith and the other Century Freeway plaintiffs, with the exception of Hawthorne, moved for a preliminary injunction and for leave to file a supplemental complaint against the City of Hawthorne and city officials. The supplemental complaint alleged violations of the Supremacy Clause, the Fair Housing Act, 42 U.S.C. §§ 3601–3631 (1982), the Fourteenth Amendment, Cal.Gov't Code § 65008 (West Supp.1988), and the Equal Protection Clause of California's Constitution. The allegations stated various claims of the violation of federal and state laws prohibiting racial and economic discrimination.

Keith sought injunctive and declaratory relief based on Hawthorne's refusal to permit the construction of the Kornblum project and the City's imposition of a 35 percent low-income covenant on the Cerise project. On April 10, 1985, the district court granted Keith leave to file the supplemental complaint. The court also permitted HCD, the California Department of Transportation ("Caltrans"), and the Kornblum project developers to intervene.

Under Fed.R.Civ.P. 65(a)(2), the parties agreed to advance the trial on the merits and consolidate it with the preliminary injunction hearing. At a bench trial on April 17, 1985, the parties submitted their evidence in the form of documents and declarations. The parties were represented by counsel and addressed the court as to each of the causes of action. Plaintiffs contended they had established a prima facie case of discrimination and argued that the defendants' proffered justifications were pretextual; defendants contended that they were entitled to disperse low-income households under the zoning laws and that the denial of the Kornblum project application was motivated by considerations of the impact on the community rather than discriminatory animus.

Soon after the one-day trial, the district court reopened the proceedings by asking the parties to provide additional information on the racial and economic composition of the relevant Hawthorne tracts and to brief the issue of plaintiffs' and intervenors' standing to sue. The standing issue apparently concerned the ability of the NAACP to represent the interests of the minority displacees.

During an evidentiary hearing on May 23, 1985, the court suggested that plaintiffs conduct a survey concerning the racial and economic status of the affected communities. In response, plaintiffs introduced additional evidence, including a door-to-door and telephone survey of Hawthorne residents residing in the relevant census tracts, information contained in Caltrans files which included information on the displacees' race, income, and housing prefer-

ences, and a summary of the Caltrans information in chart form.

On July 24, 1985, the court granted plaintiffs' motion to add three additional plaintiffs who were low-income minority Hawthorne residents living in the path of the freeway. On July 30, the court admitted into evidence the survey, the Caltrans file summary, and the charts.

On September 3, 1985, the court held that the plaintiffs and intervenors had standing to bring the action. *Keith*, 618 F.Supp. at 1145–47. The court then determined that plaintiffs had established a prima facie case of race discrimination under the Fair Housing Act and that Hawthorne had failed to show nondiscriminatory reasons for its actions. *Id.* at 1157. The court also determined that plaintiffs were entitled to relief under Cal.Gov't Code § 65008 for discrimination based on race and income. *Id.* at 1158–59. Accordingly, the court issued a final order enjoining Hawthorne from prohibiting the construction of the two housing projects. *Id.* at 1160. In a subsequent published opinion issued August 26, 1986, the district court determined that, as prevailing parties, plaintiffs were entitled to attorney's fees and costs pursuant to 42 U.S.C. § 3612(c) and Cal.Code Civ.Proc. § 1021.5. *Keith*, 644 F.Supp. at 1320–22.

Hawthorne timely appeals the judgment on the merits and the subsequent attorney's fees award.

## DISCUSSION

A. Leave to File Supplemental Complaint

██ Hawthorne challenges the district court's decision to permit the filing of a supplemental complaint. The court's ruling had the effect of keeping this proceeding before the same district judge who had presided over earlier phases of the freeway controversy. Rule 15, Fed.R.Civ.P., authorizes supplemental complaints for such a purpose. It provides that "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." Fed.R.Civ.P. 15(d). This court reviews for abuse of discretion a district court's decision to grant leave to file a supplemental pleading. *See United States ex rel. Atkins v. Reiten*, 313 F.2d 673, 675 (9th Cir.1963); *see also Chemetron Corp. v. Business Funds, Inc.*, 682 F.2d 1149, 1193 (5th Cir.1982), *vacated on other grounds*, 460 U.S. 1007, 103 S.Ct. 1245, 75 L.Ed.2d 476 (1983).

Rule 15(d) is intended to give district courts broad discretion in allowing supplemental pleadings. Fed.R.Civ.P. 15, advisory committee's note. The rule is a tool of judicial economy and convenience. Its use is therefore favored. As Judge Haynsworth observed more than two decades ago:

> Rule 15(d) of the Federal Rules of Civil Procedure provides for ... supplemental pleading. It is a useful device, enabling a court to award complete relief, or more nearly complete relief, in one action, and to avoid the cost, delay and waste of separate actions which must be separately tried and prosecuted. So useful they are and of such service in the efficient administration of justice that they ought to be allowed as of course, unless some particular reason for disallowing them appears, though the court has the unquestioned right to impose terms upon their allowance when fairness appears to require them.

*New Amsterdam Casualty Co. v. Waller*, 323 F.2d 20, 28–29 (4th Cir.1963), *cert. denied*, 376 U.S. 963, 84 S.Ct. 1124, 11 L.Ed. 2d 981 (1964).

In this case, Hawthorne first challenges the supplemental complaint as an abuse of discretion because it raises new claims. The clear weight of authority, however, in both the cases and the commentary, permits the bringing of new claims in a supplemental complaint to promote the economical and speedy disposition of the controversy. *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 668 F.2d 1014, 1057 (9th Cir.1982) ("The

purpose of Rule 15(d) is to promote as complete an adjudication of the dispute between the parties as possible by allowing the addition of claims which arise after the initial pleadings are filed."); *Rowe v. United States Fidelity & Guaranty Co.,* 421 F.2d 937 (4th Cir.1970) (reversing district court's refusal to permit filing of supplemental complaint because no prejudice from such a filing had been shown); *see also Reiten,* 313 F.2d at 675; *H.F.G. Co. v. Pioneer Publishing Co.,* 7 F.R.D. 654, 656 (N.D.Ill.1947) (permitting supplemental complaint stating new cause of action by a plaintiff acting in a new capacity); 3 J. Moore, *Moore's Federal Practice* ¶ 15.16[3] (1985); 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1506 (1971).

Hawthorne points out that the supplemental complaint involves additional statutes and labels this a "new and distinct" action. It further asserts that the two pleadings do not "arise out of the same transaction or occurrence" nor involve "common questions of law or fact." Hawthorne seeks to build into Rule 15 requirements from other rules, such as the transactional test pertaining to compulsory counterclaims, Fed.R.Civ.P. 13(a).

■ Rule 15(d), however, makes no reference to any such test. The absence of a transactional test, which is an integral part of other Federal Rules of Civil Procedure, *see, e.g.,* Fed.R.Civ.P. 13(a), 14(a), and 20, is a strong indication that this test is not required. Further, Rule 15(d) specifically permits supplemental pleadings "setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." This textually negates the argument that a transactional test is required. While some relationship must exist between the newly alleged matters and the subject of the original action, they need not all arise out of the same transaction. Professor Moore has explained the principle succinctly:

> While the matters stated in a supplemental complaint should have some relation to the claim set forth in the original pleading, the fact that the supplemental pleading technically states a new cause

of action should not be a bar to its allowance, but only a factor to be considered by the court in the exercise of its discretion, along with such factors as possible prejudice or laches.

3 J. Moore, *Moore's Federal Practice* ¶ 15.16[3] (1985).

■ Here, there is clearly a relationship among the claims in this action and the claims in the original action. This action involves a city's refusal to approve housing developments specifically meant to provide replacement housing for the Century Freeway displacees. In the original action, plaintiffs alleged that the defendants had failed to meet federal statutory requirements concerning relocation payments, relocation assistance programs, and adequate replacement housing. The district court's published order devoted nearly five full pages to the issue of the availability of replacement housing. *Keith,* 352 F.Supp. at 1346–50.

In 1981, the parties entered into a consent decree setting forth the defendants' obligations. The decree creates an Office of the Advocate for Corridor Residents, whose responsibilities include monitoring defendants' compliance with federal and state regulations pertaining to displacees' relocation rights and assisting displacees in obtaining adequate replacement housing.

Thus, it is clear that a focal point of the original proceedings was the provision of adequate replacement housing. Further, the district court specifically provided in the consent decree that it retained jurisdiction in the matter. Since the court expressly reserved its jurisdiction over later developments, an even stronger case is presented here for permitting a supplemental complaint than in *Griffin v. County School Board,* 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), where the Supreme Court approved a supplemental complaint after the district court had entered a final judgment.

The concern in the original action, the consent decree, and the supplemental complaint is the same—the availability of replacement housing for persons displaced by the Century Freeway. The Fourth Circuit

in *Rowe* also focused on the confluence of the actual objectives between the parties' original pleadings and the proposed supplemental filings. *See Rowe*, 421 F.2d at 943–44. The United States Supreme Court has rejected the kinds of objections that Hawthorne urges in arguing that the supplemental complaint was improper. The Supreme Court has stated that new claims, new parties, and events occurring after the original action are all properly permitted under Fed.R.Civ.P. 15(d).

It is contended that the amended supplemental complaint presented a new and different cause of action from that presented in the original complaint. The supplemental pleading did add new parties and rely in good part on transactions, occurrences, and events which had happened since the action had begun. But these new transactions were alleged to have occurred as a part of continued, persistent efforts to circumvent our 1955 holding that Prince Edward County could not continue to operate, maintain, and support a system of schools in which students were segregated on a racial basis. The original complaint had challenged racial segregation in schools which were admittedly public. The new complaint charged that Prince Edward County was still using its funds, along with state funds, to assist private schools while at the same time closing down the county's public schools, all to avoid the desegregation ordered in the Brown cases. The amended complaint thus was not a new cause of action but merely part of the same old cause of action arising out of the continued desire of colored students in Prince Edward County to have the same opportunity for state-supported education afforded to white people, a desire thwarted before 1959 by segregation in the public schools and after 1959 by a combination of closed public schools and state and county grants to white children at the Foundation's private schools. Rule 15(d) of the Federal Rules of Civil Procedure plainly permits supplemental amendments to cover events happening after suit, and it follows, of course, that persons participating in these new events may be added if necessary. Such amendments are well within the basic aim of the rules to make pleadings a means to achieve an orderly and fair administration of justice.

*Griffin*, 377 U.S. at 226–27, 84 S.Ct. at 1231.

Lower courts have similarly stressed the trial court's discretion in deciding whether to allow a supplemental pleading, and liberally construe Rule 15(d) absent a showing of prejudice to the defendant. *See, e.g., Lerman v. Chuckleberry Publishing, Inc.*, 521 F.Supp. 228, 231–32 (S.D.N.Y.1981) (noting that court has discretion to permit supplemental pleading when to do so will promote speedy disposition of the entire controversy, will not cause undue delay, and will not prejudice other parties' rights); *Vernay Laboratories, Inc. v. Industrial Electronic Rubber Co.*, 234 F.Supp. 161, 166–67 (N.D.Ohio 1964) (noting that motions for supplemental complaints are treated liberally in patent cases and that defendant had demonstrated no prejudice); *H.F.G.*, 7 F.R.D. at 656 ("The Federal Rules of Civil Procedure were designed to simplify judicial procedure, to adjudicate all phases of litigation involving the same parties, and to avoid multiplicity of suits. These rules must be liberally construed to give vent to the objectives which prompted their promulgation. A strict interpretation of Rule 15(d) would emphasize the formality of pleading over substance"); *Fotomat Corp. v. Interstate Mail Film Serv., Inc.*, 15 Fed.Rules Serv.2d 614, 615 (N.D.Ind. 1971) (rejecting contention that prejudice resulted from delay or further discovery in light of "overriding concern for the economical and speedy disposition of this entire controversy"); *see also Reiten*, 313 F.2d at 675 ("there is no reason to read into Rule 15(d) an inflexible limitation upon the broad power vested in the District Court to permit supplemental pleading. Under the Rule, allowance or denial of leave to file a supplemental pleading is addressed to the sound discretion of the District Court.... This interpretation of Rule 15(d) is supported by the general purpose of the Rules

to minimize technical obstacles to a determination of the controversy on its merits").

The only prejudice alleged by appellants is an after-the-fact conclusion that the district judge was biased against them. They do not, however, contend that the district judge's alleged bias amounted to judicial misconduct requiring reversal. Nor do they point to any conduct of the court in earlier stages of this litigation suggesting bias with respect to Hawthorne. Hawthorne never requested that the district judge disqualify himself. To evaluate whether a district court abused its discretion in permitting a supplemental pleading we must look to the situation as it existed at the time the supplemental pleading was allowed. *See Hasbrouck v. Texaco, Inc.,* 830 F.2d 1513, 1524 (9th Cir.1987) ("bias must stem from an extrajudicial source and not be based solely on information gained in the course of the proceedings"). We should not look to the speculations of those who subsequently did not prevail about what might have occurred before a different judge.

Finally, Hawthorne argues that the supplemental complaint was improper because Hawthorne was not one of the original defendants. It contends that there is no authority for permitting supplemental complaints unless filed by the original plaintiff against an original defendant.

Hawthorne relies on cases in which the original plaintiff sought to file a supplemental complaint against an original defendant. *See, e.g., Case–Swayne Co. v. Sunkist Growers, Inc.,* 369 F.2d 449 (9th Cir.), *rev'd on other grounds,* 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed2d 621 (1967); *Adams County v. Northern Pacific R.R. Co.,* 115 F.2d 768 (9th Cir.1940). However, the case law does not hold that a new defendant cannot be sued in a supplemental complaint. On the contrary, there is ample authority for adding new defendants in a supplemental complaint. The Supreme Court has expressly approved the addition of new parties under the Rule: "[Fed.R. Civ.P. 15(d)] plainly permits supplemental amendments to cover events happening after suit, and it follows, of course, that

persons participating in these new events may be added if necessary." *Griffin,* 377 U.S. at 227, 84 S.Ct. at 1231; *see also Corum v. Beth Israel Medical Center,* 359 F.Supp. 909, 912–13 (S.D.N.Y.1973) (permitting second supplemental complaint adding twelve defendants because "ultimate aim" of causes of action the same); *Poindexter v. Louisiana Financial Assistance Commission,* 296 F.Supp. 686, 688–89 (E.D.La.) (permitting supplemental complaint adding new defendants after entry of final decree in original cause where district court explicitly retained jurisdiction), *aff'd sub nom., Louisiana Educ. Comm'n for Needy Children v. Poindexter,* 393 U.S. 17, 89 S.Ct. 48, 21 L.Ed.2d 16 (1968); *United States v. National Screen Service Corp.,* 20 F.R.D. 226, 227 (S.D.N.Y.1957) (permitting supplemental complaint adding two defendants citing Rule 15(d) as authority).

Moreover, in this case Hawthorne has been a party to the litigation for years. Hawthorne has merely shifted from plaintiff to defendant. This shift does not require us to hold that the district court should have forced the plaintiffs to begin a new lawsuit. The shift is analogous to a realignment of the parties within ongoing litigation. We have held that the alignment of the parties as designated in the original complaint is not binding on the court. "The courts, not the parties, are responsible for aligning the parties according to their interests in the litigation." *Dolch v. United California Bank,* 702 F.2d 178, 181 (9th Cir.1983); *see also Lowe v. Ingalls Shipbuilding,* 723 F.2d 1173, 1177–78 (5th Cir.1984); *Montgomery Environmental Coalition v. Fri,* 366 F.Supp. 261 (D.D.C.1973) (expressly permitting supplemental complaint alleging new claim after realignment of the parties).

The interests of judicial economy and the liberal interpretation of Rule 15(d) favor granting leave to file the supplemental complaint in this case. All involved—plaintiffs, defendants, and district court—were familiar with the underlying action. Thus, we hold that the district court did not abuse its discretion in permitting the supplemental complaint.

## B. Standing

The district court held that the individually named plaintiffs had standing to sue for discrimination under the Fair Housing Act, 42 U.S.C. §§ 3601–3631. Those plaintiffs showed that they would be dislocated by the freeway and would like to rent an apartment in the development in question, a rental that is impossible because of the City's acts. Hawthorne nevertheless contends that the plaintiffs lack standing because they have not shown a sufficient "distinct and palpable injury ... that is likely to be redressed if the requested relief is granted." *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979), *quoting Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

■ These plaintiffs testified that they lived in Hawthorne, that they would be displaced as a result of the construction of the Century Freeway, and that they would apply to live at the proposed development. Moreover, evidence was introduced showing that all three individuals would be eligible to live in the project. The record reflects that Hawthorne's failure to approve the project caused them injury, the inability to live in the project, which the requested relief would redress. The *Simon* requirement is satisfied.

Hawthorne seeks to analogize the record in this case to that of a Sixth Circuit case, *Jaimes v. Toledo Metropolitan Housing Authority*, 758 F.2d 1086 (6th Cir.1985), where plaintiffs expressed only a generalized desire to afford better housing outside the center of Toledo and alleged that the Housing Authority was not providing it. The record in this case is very different.

This case is therefore controlled by the Supreme Court's decision in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), where the Court held that sufficient personal injuries for standing under the Fair Housing Act may be shown through discriminatory acts excluding low-income persons of a minority race from a specified housing project. In *Arlington Heights*, the Court held that a black plaintiff who sought to live in a low-income housing project planned for the City of Arlington Heights had standing because "[h]is is not a generalized grievance. Instead ... it focuses on a particular project and is not dependent on speculation about possible actions of third parties not before the court." *Id.* at 264, 97 S.Ct. at 563. Moreover, the Court noted that if relief were granted, there was a "substantial probability" that the project would be built and the plaintiff would be provided the housing he sought. *Id.* Therefore, the district court did not err in finding that plaintiffs Hillman, Wright, and Zapeta have standing to maintain this action.

The district court's decision is also in accord with decisions in other circuits. *See Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir.1977) (individual low-income plaintiffs had standing to maintain suit against Philadelphia for its failure to permit construction of a specific low-income housing project), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 1458, 55 L.Ed.2d 499 (1978); *Smith v. Town of Clarkton*, 682 F.2d 1055 (4th Cir.1982) (low-income black resident allowed to challenge town's decision not to build a particular project); *Silva v. East Providence Housing Authority*, 565 F.2d 1217 (1st Cir.1977) (prospective tenants of development allowed to sue HUD to prevent project's termination).

Hawthorne also challenges the standing of the developer-intervenor and the state intervenors, HCD and Caltrans, to maintain the California state law causes of action. Hawthorne again contends that there has been no injury in fact.

The project developer satisfies the injury in fact requirement. Hawthorne's actions in denying the developer's applications constitute an absolute barrier to constructing the housing that the developer planned to build. If relief is granted, that barrier will be removed. *See Arlington Heights*, 429 U.S. at 261–62, 97 S.Ct. at 561–62.

Likewise, the state intervenors have also suffered injury. Under the consent decree, HCD has the responsibility for implementing the Housing Plan, and has provided

financial assistance for the Kornblum project's construction. Caltrans has responsibility to aid in relocating the displacees and in constructing the Century Freeway. *See* Cal.Gov't Code § 14030; Cal.Sts. & High.Code § 135.3. Clearly Hawthorne's actions have injured both agencies through delay and added expense to their programs. If relief is granted, the barriers to implementing their programs in Hawthorne will be eliminated. *See Arlington Heights,* 429 U.S. at 264, 97 S.Ct. at 562–63.

■ The intervenors thus have satisfied the injury in fact requirement. However, because the intervenors assert claims other than federal claims, they must satisfy the prudential limitations on standing as well as the Article III minima. *See McMichael v. County of Napa,* 709 F.2d 1268, 1270 (9th Cir.1983). These prudential limitations require that plaintiffs assert their own rights and not those of a third party; that their injury is not a "generalized grievance" shared in substantially equal measure by all or a large class of citizens; and finally, that their interest is arguably within the zone of interests protected by the statute in question. *Id.*

■ The intervenors satisfy these prudential limitations. The developer has invested time and resources in this state-assisted low-income project, and thus is asserting its own interests in removing the barriers to construction, is not asserting a generalized grievance, and is within the zone of interests protected by Cal.Gov't Code § 65008. Section 65008 prohibits discrimination in housing on the basis of race or income, and specifically prohibits discrimination against residential development

ments on the basis of the race or income of its intended occupants or because the development receives state assistance.[1] Cal. Gov't Code § 65008 (West Supp.1988). Similarly, both HCD and Caltrans are asserting their own interests in carrying out their responsibilities to supply replenishment housing. The injury is not generalized but is exclusive to the two agencies, and both—as the agencies responsible for assisted relocation housing—are within the zone of interests protected by section 65008. Thus, the individually named plaintiffs and the intervenors have standing to bring this action.

C. Reopening for Further Evidence

■ This matter came before the district court for trial on April 17, 1985. The trial was concluded in one day. The court then requested post-trial briefs and took the matter under submission. During the month of May, the court sua sponte raised the issue of standing and reopened the evidentiary hearing to permit the plaintiffs to present statistical testimony, based on the fact that the census data introduced as evidence was nearly six years old. We have said that sua sponte reopening is unusual. See *Students of California School for the Blind v. Honig,* 736 F.2d 538, 540 (9th Cir.1984), *vacated and remanded on other grounds,* 471 U.S. 148, 105 S.Ct. 1820, 85 L.Ed.2d 114 (1985). However, we have held that such reopening is within the discretion of the trial court, noting that the evidence requested should both be important as a matter preventing injustice and reasonably be available. 736 F.2d at 548.

1. Section 65008 provides, in relevant part:

(b) No city, county, or city and county shall, in the enactment or administration of ordinances pursuant to this title, prohibit or discriminate against any residential development or emergency shelter because of the method of financing or the race, sex, color, religion, national origin, ancestry, lawful occupation, or age of the owners or intended occupants of the residential development or emergency shelter.

(c) No city, county, or city and county shall, in the enactment or administration of ordinances pursuant to this title, prohibit or

discriminate against a residential development or emergency shelter because the development or shelter is intended for occupancy by persons and families of low and moderate income, as defined in Section 50093 of the Health and Safety Code, or persons and families of middle income.

For the purposes of this section, "persons and families of middle income" means persons and families whose income does not exceed 150 percent of the median income for the county in which the persons or families reside.

Cal.Gov't Code § 65008 (West Supp.1988).

Hawthorne argues that the reopening was improper, and again suggests bias on the part of the district judge in requesting additional evidence in the form of a survey. Hawthorne argues that the district judge never sought evidence supporting Hawthorne's position. Hawthorne apparently assumes that the judge was specifically seeking evidence that would support the plaintiffs' position. This assumption ignores the fact that the judge had no way of knowing what the result of the survey would be. The record reflects that the judge requested the survey because he felt he needed more recent objective data in order to make an informed decision. The court expressed concern that because the racial composition of the area varied considerably over the years and the submitted evidence was out of date, current evidence was necessary to determine whether there was any discriminatory effect. The court's actions were well within the scope of discretion that we have repeatedly recognized in connection with reopenings. *See, e.g., School for the Blind*, 736 F.2d at 548; *Ellis v. Brotherhood of Railway, Airline and Steamship Clerks*, 685 F.2d 1065, 1071 (9th Cir.1982); *Berns v. Pan American World Airways, Inc.*, 667 F.2d 826, 829 (9th Cir.1982).

In arguing that reopening was improper, Hawthorne relies upon *Arthur Murray, Inc. v. Oliver*, 364 F.2d 28 (8th Cir.1966). In that case, the Eighth Circuit held that a district court abused its discretion by reopening an antitrust case, eighteen months after the parties had submitted their evidence, to receive additional evidence regarding the plaintiff's lost profits. In *Arthur Murray*, it was clear that the record was sufficient to evaluate the case without the additional evidence and the long delay was inexplicable. In the case before us, the district court determined both that the additional evidence was necessary to achieve a just disposition and that it was reasonably available, and there was no delay.

Our holding that the district court did not abuse its discretion in this case is also in full accord with the Sixth Circuit's decision in *Calage v. University of Tennessee*, 544 F.2d 297 (6th Cir.1976), which we cited and quoted with approval in *School for the Blind*. In *Calage*, a Title VII case, the district judge reopened the case sua sponte the day after the case was submitted, but before entry of judgment. The judge asked the University for further evidence that would explain why some exhibits showed disparities in the wages of men and women in comparable managerial positions. The University provided the information requested, and subsequently won the lawsuit. On appeal, the plaintiff argued that the judge's request was

> indicative of a determination by the court that at that time plaintiff had made a prima facie case entitling her to relief. Inferentially therefore, the court, harboring some predisposition in favor of the University, determined to give it a second chance to explain the disparities, a practice which plaintiff contends "did not comport with the interest of fairness and substantial justice."

544 F.2d at 301.

This is precisely the argument made by appellants in the case before us. The court in *Calage* rejected this argument, observing that there was no evidence that the judge was biased, and that "[t]he information sought here was readily available, and that the judge conceived that the justice of the case required that he have it." *Id.* at 301–02. For similar reasons, we find that the district court did not abuse its discretion in reopening the proceedings.

### D. Admissibility of the Challenged Exhibits

The next issue is the admissibility of the exhibits offered following the reopening. The exhibits at issue on this appeal are Exhibits 44, 45, and 46. Exhibit 44 is a summary report of the social survey conducted by Dr. Johnson and Social Data Analysts. The report contained the percentages of the different responses to 23 questions contained in the survey questionnaire, which was completed by 253 respondents. The district court found the summary report "a necessary aid to interpreting the survey results," and therefore ad-

missible under Fed.R.Evid. 1006. The court then went on to find the survey itself admissible as an exception to the hearsay rule under Fed.R.Evid. 803(24). *Keith,* 618 F.Supp. at 1161–63.

Exhibit 45 consists of summaries of Caltrans' files of Hawthorne displacees. Caltrans agents filled out forms called "summaries"

> for each Hawthorne displacee household, using information currently existing in the Caltrans file and information they personally knew about the displacees, but which was not recorded in the file. Agents from the Department of Housing and Community Development (HCD) then supplemented the incomplete summaries with information gained by telephone calls or personal interviews.

*Id.* at 1163. The district court found the summaries "necessary to present clearly the relevant facts contained in each file," and therefore admissible under Rule 1006, and also found the information underlying the summaries admissible under the public records exception to the hearsay rule, Rule 803(8)(C). *Id.* at 1164–65.

Finally, Exhibit 46 is a series of charts summarizing Exhibit 45, the summaries of the individual displacees. The district court found that Exhibit 46's admissibility depended upon the admissibility of Exhibit 45, and therefore admitted it into evidence. *Id.* at 1165. We separately address the admissibility of each questioned exhibit.

### 1. *Exhibit 44*

Hawthorne contends that the district court erred in admitting the Johnson survey on the grounds that it was neither necessary nor trustworthy. *See Toys "R" Us, Inc. v. Canarsie Kiddie Shop,* 559 F.Supp. 1189, 1205 (E.D.N.Y.1983) (requiring necessity and "genuine guarantees of trustworthiness" to admit survey evidence). The proponent of the survey bears the burden of establishing its admissibility. *Pittsburgh Press Club v. United States,* 579 F.2d 751, 758 (3d Cir.1978).

The proponent must show that the survey was conducted in accordance with generally accepted survey principles and that the results were used in a statistically correct manner. *Baumholser v. Amax Coal Co.,* 630 F.2d 550, 552 (7th Cir.1980). Technical inadequacies in the survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility. *Prudential Insurance Co. v. Gibraltar Financial Corp.,* 694 F.2d 1150, 1156 (9th Cir.1982), *cert. denied,* 463 U.S. 1208, 103 S.Ct. 3538, 77 L.Ed.2d 1389 (1983); *C.A. May Marine Supply Co. v. Brunswick Corp.,* 649 F.2d 1049, 1055 n. 10 (5th Cir.) (per curiam), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 974, 71 L.Ed.2d 112 (1981); *see also Piper Aircraft Corp. v. Wag–Aero, Inc.,* 741 F.2d 925, 930–31 (7th Cir.1984).

Hawthorne first argues that the survey was not necessary because the court had other trustworthy data available in the form of the 1980 federal census and information from the Caltrans files. However, the 1980 federal census data was over five years old, and the information from the Caltrans files was over two years old. Therefore, the information in the survey was more probative of the current composition of the areas in question and thus much more probative on the issue of adverse impact. *See Zippo Manufacturing Co. v. Rogers Imports, Inc.,* 216 F.Supp. 670, 683 (S.D.N.Y.1963) (necessity requires a comparison of the probative value of the survey with the evidence that could be used if the survey were excluded). There was no other current evidence.

Hawthorne also contends that the survey should not have been admitted because an improper universe of respondents was surveyed. The district court considered freeway displacees currently residing in Hawthorne as the proper universe, whereas Hawthorne argues that the universe surveyed should have included all persons displaced by the freeway who were eligible to reside in the projects.

Essentially Hawthorne argues that the group surveyed was too narrow. Hawthorne's definition of the proper universe encompasses all persons displaced, includ-

ing former Hawthorne displacees who have already relocated. However, because relocated individuals by definition have already found alternative housing, their inclusion appears unnecessary and aimed solely at reducing the percentage who would indicate interest in living at the proposed projects. The universe proposed by Hawthorne does not appear to be more appropriate than the one the district court considered.

Hawthorne's remaining methodology challenges are also without merit. Hawthorne contests the survey's general trustworthiness, the clarity of the survey questions, the qualifications of the interviewers, and the objectivity of the survey. The testimony of Dr. James Johnson, the survey director, established that the methods used were accepted social science techniques in accord with generally accepted standards in the field. *See Baumholser,* 630 F.2d at 552. Dr. Johnson testified that he was able to verify the trustworthiness of the responses by comparing for internal consistency two of the questions concerning income. 618 F.Supp. at 1163. He also testified about the survey's objectivity and the qualifications of the firms engaged to conduct the survey. The district court did not err in relying upon this reasoning to support admission of the survey into evidence. *See Debra P. v. Turlington,* 730 F.2d 1405, 1413 (11th Cir.1984) (where survey director testified that steps were taken to insure survey's trustworthiness and objectivity, court was within its discretion to admit survey as evidence).

Finally, Hawthorne contends that Johnson's testimony was insufficient to establish the foundation for the survey's admission. Yet his testimony establishes that he functioned as the survey director, even though he contracted with another firm to provide interviewers for the telephone survey. The testimony of the survey director alone is sufficient to establish a foundation. *See Piper Aircraft,* 741 F.2d at 931. The district court was within its discretion in admitting the survey as evidence.

## 2. *Exhibits 45 and 46*

Hawthorne also contends that the district court abused its discretion in admitting Exhibit 45, a summary of information contained in Caltrans files, and Exhibit 46, the summaries of Exhibit 45 set forth in chart form. Hawthorne argues that because the files were supplemented with information gathered solely for the purposes of this lawsuit, the file summary fails to fall within the public records exception to the hearsay rule.

Fed.R.Evid. 803(8)(C) excludes from hearsay public records and reports "in civil actions and proceedings ... [setting forth] factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." The presumption is one of trustworthiness, with the burden of establishing untrustworthiness on the opponent of the evidence. *See* Fed.R.Evid. 803(8)(C).

The evidence admitted here is a summary of forms completed by Caltrans agents, in response to the court's order of May 24, 1985, requesting additional information on each Hawthorne displacee household. The agents used information already contained in the files and information in their personal knowledge. State Housing Department agents supplemented incomplete summaries with information they obtained through personal interviews or telephone calls.

Hawthorne argues that Caltrans was not required to maintain information on the displacees' relocation preference, so that the data compiled regarding this preference was not the result of an investigation made pursuant to authority granted by law. The City argues that this material serves no function other than for purposes of litigation and thus falls outside the public records hearsay exception. *See United States v. Baxter,* 492 F.2d 150, 165 (9th Cir.1973) (records must serve a function beyond the litigation), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974); *see Abdel v. United States,* 670 F.2d 73 (7th Cir.1982). Hawthorne points

to the testimony of the Caltrans representative, James Dusini, who stated that Caltrans agents were not required to obtain information about relocation preferences. However, there is no reason to distinguish between records prepared before initiation of litigation and those prepared during the litigation, so long as the records meet the test set out in *Baxter:* that the records serve a function beyond the litigation.

The records here fulfill the *Baxter* requirements. Dusini testified that information about whether the displacees wanted to stay in the same neighborhood was routinely gathered. He testified that although there was no requirement that this information be retained in the files for reporting purposes, Caltrans used it to help the relocation department. Dusini also testified that in 1981–82, Caltrans obtained similar information through a survey it conducted to help with relocation. It thus appears that Caltrans routinely collected this kind of information, and that such information was not used solely for litigation purposes.

Moreover, it appears that federal and state law requires Caltrans to keep similar data to verify compliance with federal relocation benefits requirements and to determine eligibility for such benefits. *See* Uniform Relocation Assistance and Real Property Act, 42 U.S.C. § 4601; 49 C.F.R. §§ 25.9, 25.206; 23 C.F.R. § 740; *see also* Cal.Sts. & High.Code §§ 135.3, 135.5. Therefore, the district court could reasonably conclude that the supplemental information was routinely gathered in the regular course of business under authority granted by law. This evidence adequately meets the public records exception and the court did not abuse its discretion in admitting Exhibits 45 and 46 into evidence under Fed.R.Evid. 803(8)(c).

### E. Fair Housing Act

Hawthorne contends that the district court erred in holding that the City violated the federal Fair Housing Act, 42 U.S.C. §§ 3601–3631. The court found that because the City's actions had a greater adverse impact on minorities than on whites, this demonstrated a discriminatory effect,

and thus the plaintiffs had shown a prima facie case of discrimination under the Act. The court then found that the City's proffered justifications were pretextual and so held that Hawthorne had violated the Act.

 Under the Fair Housing Act it is unlawful for a person to "make unavailable ... a dwelling to any person because of race, color, religion, sex, or national origin." 42 U.S.C. § 3604(a). The Act applies to municipalities. *United States v. City of Parma*, 661 F.2d 562, 572 (6th Cir.1981), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982). To establish a prima facie case of withholding of housing for an unlawful reason under the Act, a plaintiff must show at least that the defendant's actions had a discriminatory effect. *See Smith*, 682 F.2d at 1065; *Resident Advisory Bd.*, 564 F.2d at 146–48; *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1289–90 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) (*Arlington Heights II*); *United States v. City of Black Jack*, 508 F.2d 1179, 1184–85 (8th Cir.1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975). Discriminatory effect means that "the conduct of the defendant actually or predictably results in racial discrimination.... The plaintiff need make no showing whatsoever that the action resulting in racial discrimination ... was racially motivated." *Black Jack*, 508 F.2d at 1184–85.

Some additional background is helpful in understanding this issue. This circuit has not decided whether discriminatory effect alone is sufficient to establish a prima facie case. *See Halet v. Wend Investment Co.*, 672 F.2d 1305 (9th Cir.1982). The circuits that have addressed the issue have reached different conclusions. The Third and Eighth Circuits hold that proof of discriminatory effect alone is always sufficient to establish a violation of the Fair Housing Act. *Resident Advisory Board*, 564 F.2d at 146–48 ("[w]e conclude that, in Title VIII cases, by analogy to Title VII cases, unrebutted proof of discriminatory effect alone may justify a federal equitable response");

*Black Jack,* 508 F.2d at 1184–85 ("[e]ffect, and not motivation, is the touchstone, in part because clever men may easily conceal their motivations, but more importantly, because ... 'we now firmly recognize that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme' ") (quoting *Hobson v. Hansen,* 269 F.Supp. 401, 497 (D.D.C. 1967), *aff'd sub nom. Smuck v. Hobson,* 408 F.2d 175 (D.C.Cir.1969) (en banc)). The Fourth and Seventh Circuits require consideration of four factors: (1) the strength of the plaintiff's showing of discriminatory effect, (2) whether there was some evidence of discriminatory intent, (3) what the defendant's interest was in taking the action complained of, and (4) whether the plaintiff sought to compel the defendant affirmatively to provide housing for minorities or merely to restrain the defendant from interfering with individual property owners who wished to provide such housing. *Smith,* 682 F.2d at 1065; *Arlington Heights II,* 558 F.2d at 1290. It is not necessary under the Fourth and Seventh Circuits' analysis to demonstrate strong showings as to all four factors. When presented with only two of the four factors pointing toward granting relief, the Seventh Circuit concluded the case was "close" and granted relief, declaring that "we must decide close cases in favor of integrated housing." *Arlington Heights II,* 558 F.2d at 1294.

Because this circuit to date has not established the standard necessary for a prima facie case, the district court in this case evaluated the evidence under both the Third/Eighth Circuit test and the Fourth/Seventh Circuit test. The court found Hawthorne liable under either test. 618 F.Supp. at 1148–57.

The district court found that Hawthorne's actions clearly had a discriminatory effect, therefore meeting the test used by the Third and Eighth Circuits. The court examined the 1980 census data, the Johnson survey (Exhibit 44), the plaintiffs' and state intervenors' summary of the Caltrans files (Exhibit 46), and the supplemen-

tal defendants' summary of the Caltrans files (Exhibit 214), and concluded that

> [w]ith 1,104 Hawthorne families facing displacement, and at most only 128 units of replenishment housing in the process of construction in Hawthorne, the failure promptly to start construction of the two developments at issue seriously jeopardizes the ability of a large number of minority residents to continue residing in Hawthorne. Thus, the "ultimate effect" of Hawthorne's actions, like the immediate effect, is racially discriminatory.

618 F.Supp. at 1151. The court also found that the Fourth and Seventh Circuit's test was met, noting that plaintiffs' failure to provide direct evidence of discriminatory intent did not preclude them from establishing a prima facie case due to plaintiffs' showing that three of the four *Arlington Heights II* elements existed: (1) showing a discriminatory effect, (2) showing that Hawthorne's proffered justifications were pretextual, and thus that Hawthorne had no legitimate interest in taking these actions, and (3) showing that the remedy sought was merely to enjoin Hawthorne from interfering with developers wishing to provide housing, not to compel Hawthorne to affirmatively provide housing. 618 F.Supp. at 1148–52.

■ Hawthorne contends that the district court erred in finding a discriminatory effect because the court used an inappropriate population: current Hawthorne displacees. Hawthorne suggests that the population ought to include all persons eligible to reside in the project—whether or not those individuals reside in Hawthorne and whether or not those individuals are freeway displacees.

However, Hawthorne displacees have priority in rental and the number of current displacee households greatly exceeds the number of units available in the proposed projects. Thus, in reality, only these households will have an opportunity to live in the units. The district court's decision to limit consideration of adverse impact to current Hawthorne displacees, therefore, is not an abuse of discretion. *Cf. Piper Aircraft,* 741 F.2d at 930.

█ The evidence presented shows that Hawthorne's refusal to permit construction of the project had a greater adverse impact on minorities. Of the persons who would benefit from the state-assisted housing because they are low-income displacees, two-thirds are minorities. The failure to build the projects had twice the adverse impact on minorities as it had on whites. *See* 618 F.Supp. at 1150. This showing established a racially discriminatory effect. *See Smith*, 682 F.2d at 1061. The situation is similar to that in *Arlington Heights II*, where the court pointed out that because "a greater number of black people than white people in the Chicago metropolitan area satisfy the income requirements for federally subsidized housing," the Village's refusal to permit construction of a low-income housing project had a racially discriminatory effect. 558 F.2d at 1288.

█ Hawthorne then contends that the district court erred in finding its proffered justifications pretextual. Hawthorne argued to the district court that its restrictions were justified in the interest of dispersing low-income tenants, preventing school overcrowding, and controlling traffic. The district court rejected each of these justifications, as do we.

Hawthorne justifies its 35 percent cap on low-income tenants as part of a policy of dispersing low-income tenants. However, Hawthorne has not imposed such a cap on any other developments. The district court did not err in concluding that dispersion was a pretextual reason for imposing the low-income quota.

Hawthorne also attempts to justify its denial of the Kornblum project's application on the grounds of preventing school overcrowding. However, Hawthorne approved at least one other development in the area even though such development concededly would have an impact on the schools. The fact that a large number of the proposed alternate sites are located on the very same school attendance zones as the Kornblum development cuts against Hawthorne's justifications. Any development would inevitably increase the number of students in the attendance zone.

Hawthorne also attempts to justify the denial of the Kornblum application based on increased traffic. However, Hawthorne presented no studies or other evidence indicating that traffic would increase unacceptably or presenting comparative traffic flows if the site were developed in another way.

Hawthorne further attempted to justify its denial based on excessive housing density. However, Hawthorne presented no evidence on the issue of the density of the surrounding area, and the evidence shows that it continued to give approval to the construction of other developments in the area after turning down the Kornblum Development. Additionally, as the Planning Department noted, the density of the project itself was less than that allowed under zoning regulations and was "a good example of medium density development that adequately mitigates the overpowering mass of typical two and three story developments in the area."

Hawthorne's final proffered justification is that 52 alternate parcels existed within the City, and therefore its refusal to permit the Kornblum project could not have been discriminatory. Hawthorne essentially argues that it need only identify sites where some development could occur and that the court incorrectly required that the alternate sites be suitable for the project in its present size and design and be available without undue delay.

Here, the State Housing Authority and the developer presented evidence that the proposed development could not be built on any of the alternate sites without undue delay. For Hawthorne to satisfy its burden of showing the availability and suitability of alternate parcels for the proposed projects, the court could reasonably assess the sites' suitability based on whether the developments could be built without undue delay. The court, therefore, did not err in determining that Hawthorne failed to present suitable alternate sites.

Accordingly, we conclude that plaintiffs have not shown any reason for reversing the district court's holding that Hawthorne violated the Fair Housing Act.

**F. California Government Code § 65008**

Hawthorne also contends the district court erred in holding that Hawthorne violated California Government Code § 65008. Section 65008 prohibits discrimination in housing on the basis of, among other things, race or income. *See* note 1. The district court held that Hawthorne had violated both section 65008(b) and section 65008(c).

**1. *Discrimination Based on Race***

■ Subsection (b) of section 65008 prohibits discrimination against individuals or residential developments on the basis of race. There is no California case law regarding the proof necessary to establish a violation under this section. Because the California Supreme Court has not interpreted Cal.Gov't Code § 65008, we must make a reasonable determination as to the result the state's highest court would reach if it were to decide the case. *See Molsbergen v. United States*, 757 F.2d 1016, 1020 (9th Cir.), *cert. dismissed*, 473 U.S. 934, 106 S.Ct. 30, 87 L.Ed.2d 706 (1985). Only two California appellate courts have referred to section 65008. *See Davis v. City of Berkeley*, 238 Cal.Rptr. 730 (Cal.App.1987), *review granted in part*, 744 P.2d 654, 241 Cal.Rptr. 460 (1987); *Bruce v. City of Alameda*, 166 Cal.App.3d 18, 212 Cal.Rptr. 304 (1985).

The California provision appears to serve the same purpose and contains similar language to the federal Fair Housing Act. Both 42 U.S.C. § 3604 and Cal.Gov't Code § 65008(a) use the phrase "because of race" in describing the prohibited type of housing discrimination. Therefore, it is reasonable to conclude that the proof necessary to establish race discrimination under both statutes is the same. *See Molsbergen*, 757 F.2d at 1020 (where state courts have not determined state law, federal court must make reasonable interpretation thereof). By proving a claim under the Fair Housing Act, plaintiffs also established a violation of section 65008(b).

**2. *Discrimination Based on Income***

■ Subsection (c) of section 65008 prohibits discrimination against individuals or housing developments based on the residents' low or moderate income status. The California Supreme Court has not specified the standard of proof necessary to establish income-based discrimination under section 65008(c). The California Supreme Court has held that to show discrimination based on wealth which violates the California Constitution, a plaintiff need not show discriminatory intent. *Serrano v. Priest*, 5 Cal.3d 584, 602–03, 487 P.2d 1241, 1253–54, 96 Cal.Rptr. 601, 613–14 (1971), *appeal after remand*, 18 Cal.3d 728, 557 P.2d 929, 135 Cal.Rptr. 345 (1976), *cert. denied*, 432 U.S. 907, 97 S.Ct. 2951, 53 L.Ed.2d 1079 (1977). Thus, it seems reasonable to assume that, because discriminatory intent is unnecessary under the constitutional standard, California courts would hold that such a showing is also unnecessary to prove a violation of section 65008(c).

■ The district court's factual determination that Hawthorne's denial of the Kornblum applications adversely affected low-income individuals is not clearly erroneous. Most of the Hawthorne residents who will be displaced by the Century Freeway are from low-income households. The record shows that there is insufficient existing or planned low-income housing in Hawthorne to house the displacees. Unless more low-income housing becomes available in Hawthorne, many of these displacees will have to leave Hawthorne in order to find affordable housing. Hence, by preventing the Kornblum project's construction, Hawthorne displacees are deprived of a potential opportunity to remain in the City. The record shows that there is no deficit of moderate or high income housing in Hawthorne. Moreover, few of the Century Freeway displacees are in the higher income brackets. The City's denial of the Kornblum applications, therefore, would have little, if any, effect on wealthier individuals. Because the City's actions adversely affected only low-income persons, the district court correctly concluded that Hawthorne's denial of the Kornblum applications violated section 65008(c).

### G. Attorney's Fees

Hawthorne contends that the district court erred in awarding plaintiffs $175,316.60 in attorney's fees and $6,641.29 in out-of-pocket expenses under 42 U.S.C. § 3612(c) and Cal.Code Civ.Proc. § 1021.5.

■ Under 42 U.S.C. § 3612(c), a court may award court costs and reasonable attorney's fees to plaintiffs who prevail in a Fair Housing Act claim and who are financially unable to assume their own attorney's fees and costs. *See Samuel v. Benedict*, 573 F.2d 580, 581–82 (9th Cir.1978); *Fountila v. Carter*, 571 F.2d 487, 495 (9th Cir.1978). Here, the district court determined that because Keith successfully litigated his Fair Housing Act claim, he was entitled to attorney's fees and costs pursuant to section 3612(c). 644 F.Supp. at 1320. The court also found that, because two of the named plaintiffs had an annual family income of $12,000 and the third plaintiff's annual income was $14,000, they were financially unable to assume legal fees exceeding $103,000. Hawthorne does not challenge the district court's finding with respect to plaintiffs' ability to assume their own costs and attorney's fees. Rather, it limits its argument to an assertion that the district court erred in its judgment on the merits, and hence plaintiffs are not prevailing parties within the meaning of section 3612(c).

Since we find the court's judgment on the merits was correct, Keith is a "prevailing party" within the meaning of the statute. *See Samuel*, 573 F.2d at 582. Therefore, he is entitled to the attorney's fees award.

■ The district court also awarded Keith attorney's fees and costs under Cal. Code Civ.Proc. § 1021.5. This section, which codifies the private attorney general doctrine, permits an award of attorney's fees to a successful party when (1) the litigation enforced an important right affecting the public interest, (2) a significant benefit was conferred on a large class of persons, and (3) the necessity and financial burden are such that an award of attorney's fees is appropriate. *See Woodland Hills Residents Association, Inc. v. City Council*, 23 Cal.3d 917, 933–34, 593 P.2d 200, 208, 154 Cal.Rptr. 503, 511–12 (1979); *Sundance v. Municipal Court*, 192 Cal. App.3d 268, 237 Cal.Rptr. 269, 271 (1987).

Here, by successfully litigating his state law claims, Keith enforced his right to be free from discrimination based on race and income. These rights are "important" rights affecting the public interest. *See Woodland Hills*, 23 Cal.3d at 935–36, 593 P.2d at 209–10, 154 Cal.Rptr. at 512–13 (private attorney general doctrine is proper in litigation involving race discrimination); *Bruce*, 166 Cal.App.3d at 22, 212 Cal.Rptr. at 307 (locally unrestricted low-cost housing is a matter of vital state concern). Hence, Keith has satisfied the first requirement under section 1021.5.

By requiring Hawthorne to permit construction of the two developments, Keith enabled a large number of Hawthorne displacees to find affordable housing. He also saved the state both time and money by alleviating the state's need to find alternative housing arrangements for freeway displacees excluded from the Kornblum project. Accordingly, Keith conferred a substantial benefit on a large number of people, and thus satisfied the second requirement of section 1021.5.

Finally, as the district court found, no governmental agency was willing to protect Keith's rights under Cal.Gov't Code § 65008. 644 F.Supp. at 1321. Thus, to vindicate his rights, Keith had to bring the suit personally. The court also found that, because Keith's potential gain from the suit was merely the prospect of securing affordable housing, the litigation costs exceeded his personal stake in the outcome. *Id.* Accordingly, both the necessity and financial burden of Keith's suit made the award of attorney fees appropriate. *See Beach Colony II v. California Coastal Commission*, 166 Cal.App.3d 106, 112–15, 212 Cal.Rptr. 485, 490–91 (1985). Thus, Keith met the third condition of section 1021.5.

Because Keith met each of the three requirements of section 1021.5, the district court did not abuse its discretion in award-

ing attorney's fees and costs pursuant to that section.

AFFIRMED.

NORRIS, Circuit Judge, dissenting:

I

This action was initiated in 1972 against various federal and state agencies and officials responsible for funding and constructing the Century Freeway in Los Angeles County. The complaint sought to assure protection of the environment and to guarantee the availability of replacement housing for persons displaced by the freeway on a nondiscriminatory basis.[1] In the claims that are relevant to this appeal, plaintiffs charged federal and state defendants with violating federal statutes protecting homeowners, tenants and businessmen who would be forced to relocate because of the construction of highways funded with federal aid.[2]

The City (the "City") of Hawthorne was not named as a defendant in the original complaint, nor could it have been. As a municipality, the City had no responsibility for funding or building the freeway. Shortly after the initial complaint was filed, the City voluntarily became a *plaintiff* in the action, thereby committing its resources to assist the NAACP and the other plaintiffs in prosecuting the case.

Years after a preliminary injunction was issued halting all work on the freeway, the parties entered into a consent decree which was approved by the district court on September 22, 1981. The stated goal of the consent decree is "to provide for the housing needs of those living in the area of the proposed path of the freeway." Excerpt of Record (ER) at 3. In order to accomplish this goal, the consent decree adopts a Housing Plan which requires the state and federal defendants to make 3,700 units of housing available to help house the 21,000 persons who would be displaced by the freeway. The decree requires that 55 percent of the replacement units be affordable to low-income households and 25 percent be affordable to moderate-income households. The consent decree imposes no obligation on the City, the NAACP, or any other plaintiff to provide replacement housing, to provide funding for replacement housing, or to assist the defendant state and federal agencies in performing their obligations to provide replacement housing.

The consent decree designates the California Department of Housing and Community Redevelopment (HCD) as the agency responsible for administering the Housing Plan. Using funds provided by the federal and state defendants, HCD contracted with private developers to build housing units

1. Specifically, plaintiffs claimed that defendant federal and state agencies and officials had failed to comply with the procedural requirements of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–4347, and its California counterpart, the Environmental Quality Act of 1970 (CEQA), Cal.Pub.Res.Code §§ 21000–21151.

Plaintiffs claimed that the federal defendants violated section 102(c) of NEPA, 42 U.S.C. § 4332(2)(c), which requires federal agencies to prepare environmental impact statements for legislation and "other major Federal actions significantly affecting the quality of the human environment...."

Plaintiffs claimed that state defendants violated section 21100 of CEQA, which requires all state agencies to prepare a detailed statement analyzing the environmental impact of any "project they propose to carry out which could have a significant effect on the environment of the state."

2. Plaintiffs claimed that defendant Federal Highway Administration [FHWA] violated vari-

ous provisions of the Uniform Relocation Assistance and Real Property Act of 1970, 42 U.S.C. §§ 4601–4655, which prevents the FHWA from funding construction of any highway that will cause displacement of persons living in the highway corridor unless FHWA has received from the state highway authorities "satisfactory assurances": (1) that "fair and reasonable relocation" payments for moving expenses and for "replacement housing" will be provided to persons who must relocate; (2) that "relocation assistance programs" will be provided for such displaced persons; and (3) that "within a reasonable period of time prior to displacement there will be available" adequate replacement housing. 42 U.S.C. § 4630 (1983).

In addition to these claims, plaintiffs claimed that state defendants violated section 128(a) of the Federal–Aid Highway Act, 23 U.S.C. § 128(a), which required them to hold public hearings to consider the economic effects of constructing a freeway at the proposed location.

which would be offered (for sale or rental) on a priority basis to households displaced by the freeway.

This appeal arises out of an agreement between HCD and a developer for the construction of a 96-unit apartment complex in Hawthorne known as the Kornblum project. The Kornblum developer's applications for a building permit, a lot split, a zoning change, and a site development permit were denied by the Hawthorne City Council.[3]

Following the City's rejection of the Kornblum project, plaintiffs filed a supplemental complaint against the City which is the subject of this appeal. The gravamen of the supplemental complaint is that in turning down the Kornblum project the City violated various state and federal laws which prohibit discrimination against minorities and low-income households. Specifically, the supplemental complaint alleged that the City violated the federal Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, which guarantees equal opportunity in housing without regard to race or color. The City was also charged with violating Cal.Gov't Code § 65008, which prohibits discrimination in housing on the basis of race, color, or low-income status. Next, the plaintiffs claimed that the City violated Cal.Gov't Code § 65583 by failing to adequately take account of the Century Freeway displacement in devising its local Housing Element.[4] Finally, the supplemental complaint claimed violations of the federal and state constitutions. On April 15, 1985, the district court granted plaintiffs' motion for leave to file the supplemental complaint under Federal Rule of Civil Procedure 15(d).

## II

Rule 15(d),[5] which permits supplemental pleadings, focuses on events which have occurred after the date of the original pleading. Thus, a supplemental pleading is one designed to bring earlier pleadings up to date. *See generally,* 6 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1510 (1971).

In this appeal the City argues that the district court abused its discretion in granting some plaintiffs leave to file a supplemental complaint against a co-plaintiff because there is absolutely no connection in law or fact between the issues framed by the original complaint and the issues framed by the supplemental complaint. The City argues that the supplemental complaint pleads a "new and distinct" case, and that the original and supplemental pleadings neither "arise out of the same transaction or occurrence" nor involve "common questions of law or fact." Opinion at 474.

## A

The majority characterizes the City's position as advocating a transactional test for

---

**3.** The majority recites that the Council voted to deny the applications after some local residents expressed opposition to low-income families in their neighborhoods and voiced concerns about increased crime and traffic. Opinion at 472. That some residents expressed such concerns is irrelevant to this appeal. City authorities routinely consider the impact of a proposed development project on traffic density, crime, and schools in deciding whether to approve it. What is relevant is that the district court expressly found that the City Council did not act with discriminatory intent. ER at 99.

**4.** A Housing Element is one part of a general plan local governments are required to prepare under California law. The Housing Element "shall consist of an identification and analysis of existing and projected housing needs and a statement of goals, policies, quantified objectives, and scheduled programs for the preserva-

tion, improvement, and development of housing...." Cal.Pub.Res.Code § 65583 (West 1983).

**5.** Rule 15(d) provides:

Upon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of pleading sought to be supplemented. Permission may be granted even though the original pleading is defective in its statement of a claim for relief or defense. If the court deems it advisable that the adverse party plead to the supplemental pleading, it shall so order, specifying the time therefor.

If leave to file a supplemental pleading is not granted, the moving party is free to commence a new and independent action.

Rule 15(d), a test the majority rejects. Opinion at 474. In turn, however, the majority fails to come up with any meaningful test of its own. The majority reaches a result it obviously deems desirable—it affirms the district court's exercise of discretion in permitting the supplemental complaint—but it leaves us in the dark as to the standards which govern a district court's discretion to permit supplemental pleadings under Rule 15(d).[6]

The majority acknowledges, as it surely must, that "some relationship must exist between the newly alleged matters and the subject of the original action." Opinion at 474. But the majority fails to give us any clue as to what the nature of that relationship must be. As best I can determine, the majority adopts a "concern" test: The supplemental complaint was permitted because "[t]he concern in the original action, the consent decree, and the supplemental complaint is the same—the availability of replacement housing for persons displaced by the Century Freeway." Opinion at 474. I respectfully submit such a "concern" test is meaningless for the purpose of determining whether a sufficient nexus exists between original and supplemental pleadings to satisfy Rule 15(d). The fact that plaintiffs are motivated by the laudable goal of affordable replacement housing for freeway displacees establishes no nexus that could possibly satisfy the requirements of Rule 15(d).

The concerns of plaintiffs are not the concerns of Rule 15(d). As the majority recognizes, "Rule 15(d) is a tool of judicial economy and convenience." Opinion at 473. However, the majority fails to make any showing that *permitting the supplemental complaint in this case serves either of these goals*. In order to satisfy Rule 15(d), surely there must be some articulable reason to believe the two pleadings are connected; there must be some nexus. Neither the district court nor the majority

has identified any such connection in this case because none exists. To put it quite simply, there is nothing to link the original and supplemental pleadings in this case.

## B

The district court, at least, recognized the importance of identifying some nexus between the two pleadings, and attempted to find legal questions that are common to the original and supplemental complaints. The closest the district court came to identifying a common question of law was its vague assertion that the supplemental complaint "basically concerns an interpretation of the replenishment housing provisions of the Consent Decree." ER at 151. The district court, however, failed to specify a single issue of interpretation of the consent decree common to the two pleadings. In fact, the district court's assertion is not grounded in reality. As noted above, the consent decree imposes no obligations on municipalities in general nor the City of Hawthorne in particular. Indeed, to the extent that the consent decree even touches on the rights or responsibilities of Hawthorne or other municipalities, it does so in order to emphasize that the "replacement units [mandated by the decree] shall be relocated or constructed so as to be in conformity with applicable zoning, subdivision and building code laws." ER at 30. In sum, there is no basis for the assertion that a denial of leave to file the supplemental complaint could lead to "the possibility of another court rendering an interpretation of the Consent Decree ..." ER at 151.

The majority is no more successful than the district court in identifying common issues of law. After stating that "a focal point of the original proceedings was the provision of adequate replacement housing," and that "the district court's published order devoted nearly five full pages to the issue of the availability of replacement housing," Opinion at 474, the majority

---

**6.** The final two sentences of the majority's discussion of the supplemental complaint issue read: "All involved—plaintiffs, defendants, and district court—were familiar with the underlying action. *Thus,* we hold that the district court did not abuse its discretion in permitting the

supplemental complaint." Opinion at 477 (emphasis added). I cannot believe that the majority intends to suggest that *familiarity* with the lawsuit should be the standard by which to limit Rule 15(d) discretion.

concludes that the "concern" for replacement housing is present in both claims. Conspicuously missing is any explanation of how this "concern" translates into any common legal questions the adjudication of which in the same lawsuit would be judicially economical or convenient, especially since the issues raised by the original complaint have already been resolved in the form of the consent decree.

This failure on the part of the district court and the majority is not hard to understand. To my mind, the issues of law raised by the two pleadings are totally different. The federal and state statutory and constitutional provisions relied upon in the supplemental complaint against the City of Hawthorne as the defendant bear no relationship to the legal questions arising out of the original complaint naming as defendants state and federal officials and agencies responsible for funding and building the Century Freeway.[7] The laws relied upon in the supplemental complaint prohibit government from discriminating against *all* minorities and poor people. Whether the victims of the alleged discrimination happen to have been displaced by a freeway is irrelevant to the question whether the City, in rejecting the Kornblum project, unlawfully discriminated against minorities or low-income households. To put it differently, whether persons displaced by the Century freeway would occupy the Kornblum project if built is simply extraneous to the claims made against the City in the supplemental complaint. Those claims rest upon laws which prohibit cities from discriminating invidiously in their housing policies no matter where the prospective tenants or owners come from. What *is* relevant to the discrimination claims in the supplemental complaint is whether the Kornblum units would be occupied by minority or low-income persons, regardless of where these persons had previously lived.

Another way to look at it is to examine the classes of persons who are protected by the laws relied upon in the two pleadings. The class of persons protected by the laws relied upon in the supplemental complaint —i.e., persons of low-income or minority status—is distinct from the class of persons who are protected by the laws relied upon in the original complaint—*i.e,* persons displaced by the Century Freeway. The fact that there is some overlap between the classes does not in itself create common legal questions. Suppose, for example, freeway displacees as a class sued, on a third-party beneficiary theory, an independent contractor hired by the HCD, claiming that the contractor had defectively built housing units which were to be occupied by displacees. Surely, such a claim would raise "concerns" about the adequacy of replacement housing mandated by the consent decree. Under the standardless approach taken by the majority, a supplemental complaint based on such a contractual theory could not be distinguished on any principled basis from the supplemental complaint at issue in this appeal.

C

Just as the district court and the majority have failed to identify a single issue of law common to the original and supplemental complaints, each has failed to identify a single issue of fact common to the two pleadings. The district court noted generally, without specific example, that "[s]ome allegations asserted in the supplemental complaint are similar to those raised in the underlying action, for example, violations of state and federal anti-discrimination statutes." ER at 151–52. As discussed above, however, the statutory provisions relied upon in the original complaint are different and speak to entirely different problems, and protect an entirely different class of persons, than the statutes relied upon in the supplemental complaint. It is

---

7. The sixth claim in the supplemental pleading arguably *relates* at least tangentially to the Century Freeway project. Plaintiffs claimed that in failing to take account of the housing effects of the Century Freeway, defendant Hawthorne violated Cal.Gov.Code § 65883, which deals with housing plans that municipalities must promulgate. What is crucial, however, is that there are no questions of law common to section 65883 and the statutory and constitutional provisions relied upon in the original complaint.

also telling that the majority makes no attempt to identify a single issue of fact which is common to the two pleadings.

This failure by the district court and the majority to identify common questions of fact is also unsurprising. The operative facts in the supplemental complaint bear no relationship to the operative facts in the original complaint. Indeed, the claims raised by the supplemental complaint could be adjudicated without a single reference to the consent decree which settled the claims raised in the original complaint. In sum, just as there are no common questions of law, there are no common questions of fact linking the two pleadings.

## D

The case law provides no support for the majority's standardless application of Rule 15(d). In *Griffin v. County School Board*, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), a supplemental complaint was filed in response to an attempt by the legislature of Virginia to cut off funds for public schools after the district court ordered a local school board to desegregate the public schools. The Supreme Court upheld a supplemental complaint against the legislature because the supplemental complaint did not plead "a new cause of action, but [was] merely part of the same old cause of action arising out of the continued desire of colored students in Prince Edward County to have the same opportunity for state-supported education afforded to white people." *Griffin*, 377 U.S. at 226, 84 S.Ct. at 1231. Thus, the injury to the minority schoolchildren *resulted from the breach of a duty to provide public education on a desegregated basis—a duty that was shared by state and local officials.* Here, the duty of state and federal officials and agencies to provide replacement housing for freeway displacees is not shared by the City of Hawthorne. Moreover, the protected class in *Griffin* remained the same; here, as noted above, the classes protected by the

statutes relied upon in the two pleadings are different. For these reasons, *Griffin* provides no support for the majority's position.

The majority's reliance on *United States ex rel. Atkins v. Reiten*, 313 F.2d 673 (9th Cir.1963), is similarly misplaced. In *Reiten*, a materialman brought suit on a payment bond pursuant to the Miller Act, 40 U.S.C. § 270a(a)(2), to receive payment for material furnished to a government contractor. The district court dismissed the initial complaint, which was filed less than 90 days after the last material had been furnished to the contractor, because the Miller Act provides a cause of action for payment only after 90 days have passed. Our court upheld the district court's exercise of discretion in permitting a supplemental complaint filed by the materialman after 90 days had passed. In *Reiten*, the underlying factual and legal issues framed by the initial and supplemental complaints were identical. The plaintiff materialman had only one right—that conferred to him by the Miller Act—to recover on the payment bond. The elements of the plaintiff's case did not vary under the original and supplemental pleadings: first, he had to prove he had entered into a contract with the government contractor; second, he had to prove that he had furnished the materials; third, he had to show he had not been paid in full; finally, he had to prove that 90 days had passed since he delivered the materials. The original complaint was dismissed only because the materialman had failed to satisfy the 90–day requirement. It is unremarkable, then, that our court allowed him to update his lawsuit by pleading intervening facts—that 90 days had passed—under Rule 15.[8]

By contrast, the issues framed by the supplemental pleading involved in this appeal are distinct from, and involve different legal and factual questions than, the issues framed by the original complaint. Because

---

**8.** Nor does *H.F.G. Co. v. Pioneer Publishing Co.*, 7 F.R.D. 654 (N.D.Ill.1947), which the majority cites, support the majority's argument. In permitting a Rule 15(d) supplemental complaint in a derivative action to recover monies allegedly

embezzled by the company president, the district court in *H.F.G.* explicitly focused on the common factual questions that would make it more judicially economical to try the different causes of action together. 7 F.R.D. at 656.

plaintiffs here are not merely updating a lawsuit to vindicate a single right, but rather are trying to use Rule 15(d) as a vehicle for expanding the original case into a new action against a co-plaintiff on totally unrelated claims, the cases relied upon by the majority fail to support its construction of Rule 15.[9]

E

The majority's reading of Rule 15(d) also creates tension between Rule 15(d) and other Federal Rules of Civil Procedure. Rule 13(g), for example, deals explicitly with cross-claims by one plaintiff against another. Rule 13(g), however, like Rule 13(a) governing compulsory counterclaims, requires that the cross-claim arise out of the same "transaction or occurrence" as the original claim, a standard the majority expressly rejects when construing Rule 15(d). Opinion at 474. It strikes me as anomalous to allow a plaintiff to circumvent the "transaction or occurrence" requirement of Rule 13(g) by recharacterizing a cross-claim against a co-plaintiff as a supplemental complaint under Rule 15(d). And yet this is precisely what the majority does in this case.[10]

CONCLUSION

I dissent in this case even though I applaud the consent decree's worthy goal of providing affordable housing for persons who are displaced by the Century Freeway. To me, however, this appeal is not about housing; this appeal is about the limits on official power—specifically, judicial power. In pursuit of the laudable goal of housing for freeway displacees, the district court and the majority have failed to justify the supplemental complaint in this case on any

principled basis. They leave me no choice but to dissent.

---

9. The majority also cites a number of cases which stand for the general proposition that a district court is afforded a great deal of discretion in deciding whether to permit a supplemental pleading. Opinion at 474–475. To say there is discretion, however, is to say nothing about the appropriate standards for determining the limits on that discretion.

10. *See also* Federal Rule of Civil Procedure 20(a), which in pertinent part provides: "... All

persons (and any vessel, cargo or other property subject to admiralty process in rem) may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action...."