John Witten TUNNELL, Plaintiff,

v.

FORD MOTOR COMPANY, Defendant.

No. CIV.A. 4:03CV00074.

United States District Court,
W.D. Virginia,
Danville Division.

Aug. 4, 2004.

Fred Dempsey Smith, Jr., James Warren Haskins, Young Haskins Mann & Gregory PC, Martinsville, VA, for Plaintiff.

Barry C. Toone, Paul G. Cereghini, Bowman & Brooke LLP, Phoenix, AZ. Brian K. Telfair, Julie A. Childress, Bowman and Brooke LLP, Richmond, VA, John R. Reid, Jr., Cabaniss Smith Toole & Wiggins PL, Maitland, FL, for Defendant.

## MEMORANDUM OPINION

MOON, District Judge.

Pursuant to the authority in 28 U.S.C. § 636(b)(1), this matter was referred to The Honorable Michael F. Urbanski, United States Magistrate Judge, for proposed findings of fact, conclusions and recommendations for the disposition of: (i) certain motions filed by defendant Ford Motor Company ("Defendant") to exclude the

testimony of plaintiff John Witten Tunnell's ("Plaintiff") expert witnesses Charles Crim ("Crim"), Samuel McKnight ("McKnight"), Marjorie Adams ("Adams"), Pamela Kiecker ("Kiecker") and Jerry Wallingford ("Wallingford") and (ii) Defendant's Motion for Summary Judgment.

The Report and Recommendations that was issued in connection with Defendant's motions to exclude the testimony of Plaintiff's expert witnesses was entered on June 28, 2004 (the "June 28, 2004 Report"). Defendant filed objections on July 13, 2004. Plaintiff filed objections on July 13, 2004. Plaintiff filed its response to Defendant's objections on July 23, 2004. Defendant filed its response to Plaintiff's objections on July 26, 2004. A hearing was held in connection with this matter on July 28, 2004.

■ A judge of the court may reconsider any non-dispositive pretrial matter where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A); *see also* Fed.R.Civ.P. 72(a) (stating that a district judge shall modify or set aside any portion of a magistrate judge's order issued in connection with a pretrial matter not dispositive of a claim or defense that is found to be clearly erroneous or contrary to law). The issue in this case is whether the surveys relied upon by Kiecker and Adams are based on an Information Piece that is biased in favor of Plaintiff.

■ In order for the opinions of Adams or Kiecker to be admissible, the Court must first conduct a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469. As part of its assessment, the Court

is directed to consider the existence and maintenance of standards controlling the technique's operation. *Id.* The June 28, 2004 Report recognized the Reference Manual on Scientific Evidence as instructive as to the admissibility and use of survey evidence. (June 28, 2004 Report) (relying on the Federal Judicial Center, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, *Reference Guide on Survey Research*, 229–276 (2d ed.2000)).

■ The REFERENCE MANUAL ON SCIENTIFIC EVIDENCE cautions against attorney involvement in conducting the survey. *See id.* at 237. Plaintiff's counsel was the main drafter of the Information Piece for the Adams survey. Exhibit A to Defendant's Objection to Magistrate's Recommendation Regarding Ford's Motions to Exclude Plaintiff's Experts. The same Information Piece was also utilized with the Kiecker survey. Plaintiff's June 6, 2004 Memorandum in Opposition to Defendant's Motion to Exclude Plaintiff's Expert Witness Pamela Kiecker, Ph.D., pp. 3–4. The Information Piece reads, in relevant part:

**One way to prevent damaged electrical wiring from becoming an ignition source is to equip the motor vehicle with a safety device that will disconnect the battery in a collision. Here is a 1999 Mustang equipped with a battery disconnect. These devices have been available since 1975 and they are designed to shut off the electrical energy in the event of a crash.**

"Post–Collision Fires," Exhibit A to Defendant's Objection to Magistrate's Recommendation Regarding Ford's Motions to Exclude Plaintiff's Experts.

Defendant maintains that the Information Piece presents:

[A] very brief and narrow description of safety devices to prevent post-collision fires. The Information Piece begins with a conclusionary statement that

for the past 30 years both the government and the motor vehicle industry have recognized that occupants of motor vehicles that cannot get out of the car following an accident are at risk of serious injury and even death caused by fires that start in a motor vehicle. There is absolutely no need for this inflammatory statement in the survey. The survey could have easily been conducted without this opening statement. Consequently, the respondents state of mind was already influenced and directed toward a favorable response for Plaintiff because there is an inference that could be drawn by respondents that the motor vehicle industry and the government have known about this problem for thirty years and have done nothing about it.

Defendant's May 7, 2004 Memorandum of Law in Support of its Motion to Exclude the Testimony of Dr. Marjorie E. Adams, pp. 10–11. Thus, Defendant contends that the Information Piece is no more than an opening statement from Plaintiff's counsel, "one with no rebuttal." *Id.* at 12. No pros and cons were discussed,[1] nor was the position taken by the automobile manufacturers with respect to such devices presented. *Id.* In short, respondents were asked to address a complex question after being presented with little or no facts on which to base their decision.

Moreover, Defendant points out that a photograph of a 1999 Mustang equipped with a battery disconnect device is presented to the respondents and is incorporated within the discussion of the material included within the Information Piece. *See* Attachment 2 to Exhibit A Defendant's June 13, 2004 Objection to Magistrate's Recommendation Regarding Ford's Motions to Exclude Plaintiff's Experts. De-

fendant submits that the information becomes particularly misleading when the statement, "Here is a photograph of a 1999 Mustang equipped with a battery disconnect" is made in conjunction with that visual. Tr. Tran. 119:21–23. According to Defendant, this creates the misperception that the 1999 Mustang was sold with a battery disconnect, when, in fact, it was not. Tr. Tran. 120:7–9. Respondents are then asked whether they would expect a car purchased in 1999 to have this type of device. Tr. Tran. 120:19–22. The result, according to Defendant, is obvious and essentially constitutes an opinion poll that usurps the function of the jury. Tr. Tran. 125:23–25.

Plaintiff counters that the arguments made by Defendant go to the *weight* of the evidence, as opposed to its *admissibility*. Tr. Tran. 138:18–22. The Court acknowledges the arguments raised by both parties. Nevertheless, the Court determines that the surveys, as presented, are unfairly skewed in favor of Plaintiff. While cross examination may reveal the unfairness of the survey to the jury, it will not provide the answers that survey respondents would have given had the questions not been worded in a manner that was biased. Thus, the Court finds that the portion of the June 28, 2004 Report that addresses the testimony to be provided by Adams and Kiecker is clearly erroneous.

Based on the above, the Court DECLINES TO ADOPT the June 28, 2004 Report in its entirety. Specifically, the Court DECLINES TO ADOPT the portion of the June 28, 2004 Report that addresses the testimony to be provided by Adams and Kiecker. The portion of the June 28, 2004 Report that addresses the testimony to be provided by Crim,

---

1. Defendant asserts that this was not a safety device, but an unsafe device. Tr. Tran. 119:19–20; 124:7–11.

McKnight and Wallingford, however, is ADOPTED.

Judgment, remains under consideration at this time. The Court will continue to review this matter and will issue an appropriate Order at a later date.

The Clerk of the Court is hereby directed to send a certified copy of this Order to all Counsel of Record and to Magistrate Judge Urbanski.

## REPORT AND RECOMMENDATION

URBANSKI, United States Magistrate Judge.

This matter is before the court for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) concerning defendant Ford Motor Company's motions to exclude the testimony of plaintiff Tunnell's expert witnesses Charles Crim, Samuel McKnight, Marjorie Adams, Pamela Kiecker and Jerry Wallingford. These issues have been exhaustively briefed and argument was conducted on June 10, 2004.

### OVERVIEW

It is recommended that the motions to exclude fire origin experts Charles Crim and Samuel McKnight be overruled as these experts fully meet the requirements for expert testimony under Fed.R.Evid. 702 and the standard established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Further, it is recommended that the motions to exclude survey experts Pamela Kiecker and Marjorie Adams be overruled as they fully meet the requirements for survey expert testimony under Fed.R.Evid. 702, and the case law teaches that the objections raised by Ford concerning their surveys go to the weight to be attributed to this evidence and not its admissibility. Ultimately, the question of consumer expectations as regards battery disconnect devices is for the jury to decide, and the Adams and Kiecker surveys may assist the trier of fact to determine this issue. Finally, Ford's objections to certain opinions of expert witness Jerry Wallingford are granted in part and overruled in part. Based on his knowledge, experience, education, examination of the vehicle, review and study of the literature and industry practices regarding battery disconnect devices and his development and construction of an exemplar device from existing materials, Wallingford may render opinions I, II, VIII and IX as set forth in his report. While Wallingford certainly may rely upon published literature, Ford and industry documents and other evidence to establish whether a battery disconnect device was practical, feasible and cost effective, he should not be permitted to opine as to essentially factual matters extant in other sources of proof which are reflected in opinions III through VII of his expert report. Thus, while Wallingford may testify that battery disconnect devices such as the one he installed as an exemplar on a 1999 Mustang GT were practical, feasible and would have eliminated a known hazard in 1999; he may not express, in the form of opinion testimony, essentially factual matters such as the state of Ford's knowledge in 1999 or its response to the hazard posed by post-collision electrical fires. Such facts may be established by other means and cannot be presented in the guise of expert opinions as such evidence does not fall within the strictures of Fed. R.Evid. 702. Finally, Wallingford may not offer opinion testimony concerning other similar incidents based on federal motor vehicle fatality statistics as that data does not support Wallingford's conclusion.

### STATEMENT OF FACTS

On November 18, 1999, Plaintiff Tunnell was in the front passenger seat of a 1999 Ford Mustang GT which collided with a utility pole in Henry County, Virginia. Tunnell suffered a broken leg and was

pinned in the vehicle by the resulting damage from the collision. Minutes after the collision, but before Tunnell could be freed from the wreckage, a fire ignited in the passenger compartment. Some eyewitnesses at the scene believed the fire to be electrical in origin because of the odor of the fire, and because they saw blue "sparking" in the dashboard. Specifically, one eyewitness, Sally Jinright, testified that she "noticed a flickering like in the center of the dash in the console area and I started smelling what smelled like electrical wires burning and everything." Jinright Dep. at 7. When asked how tall the flame was, Jinright testified that "[i]t was just a flicker like behind the console, behind the dash. I couldn't tell. . . . It was kind of like a bluish flickering." Another eyewitness, Cynthia Weaver, testified that she saw a "spark" "right in through one of those vents" located to the right of the passenger seat. Weaver Dep. at 29–30. Weaver described the "spark" as being "like a light, a butane lighter. Like when you first strike a butane lighter, it's blue and then the blue spark just kind of ran up a little bit and then it kind of beared off and then it started turning bright yellow like orange." Weaver Dep. at 30–31. Tunnell, pinned inside the car for roughly forty-five minutes, was severely burned as fire engulfed the car's interior.

Tunnell brings this product liability action against Ford for breach of implied warranty and defective design as a result of his burn injuries. Tunnell claims that the 1999 Mustang GT was defective in design and unreasonably dangerous because it did not have a safety device to disconnect the battery after the collision, which he contends would have prevented the fire from starting. By means of expert testimony, Tunnell will seek to prove that the fire started in the dashboard because the wiring harness was crushed on impact. As there was no battery disconnect device or other means to shield the

wires from crush damage, the still energized wires were crushed in the impact, causing an electrical event known as a high resistance fault. Tunnell's experts claim, based on their examination of the vehicle employing national fire origin investigation methodology, that the fire was caused by a high resistance fault. A characteristic of such a fault is that it could have started a fire without blowing a fuse.

Although there are no government or industry standards requiring automobile manufacturers to equip vehicles with such devices, the auto industry has been aware of the hazard associated with post-collision fires for years. Tunnell expects to introduce evidence that Ford's internal studies of this issue dating back to 1975 state that installation of such devices would have eliminated post-collision fires by eight-five (85%) percent. In 1978, Ford estimated the cost of available battery-disconnect switches to be $2.50 (in 1973 dollars). Further, the National Highway Transportation Safety Administration asked the industry to comment on the efficacy of such devices in 1975 and 1995. Thus, the hazard was well known. In fact, Ford uses an inertia disconnect switch to shut off power to the fuel pump in the case of impact. Therefore, Tunnell contends that such an inertia disconnect device should have been attached to the battery as well. Nevertheless, it is undisputed that no Ford or other vehicle sold in 1999, or since, had such an inertia battery disconnect device.

Tunnell's expert engineer, Jerry Wallingford, has installed such a device on a 1999 Mustang GT, and opines that this device, coupled with other commonly available materials, would have prevented Tunnell's burn injuries. At least one of Ford's deposed witnesses, Victor DeClercq, appears to agree. DeClercq testified that Ford considered a battery disconnect device as a means to prevent vehicle fires,

and admitted, albeit tentatively, that "at least it's a possibility, that an electrical cutoff may have assisted or may have helped in this case. And that's not even completely certain in my mind yet." De-Clercq Dep. (7/29/02) at 47.

Tunnell seeks to establish a breach of implied warranty by proving that Ford failed to meet reasonable consumer expectations regarding such a battery disconnect device. As evidence of reasonable consumer expectations, Tunnell offers circumstantial evidence regarding the industry's awareness of the hazard and the feasibility of a safety measure, as well as direct evidence in the form of retrospective consumer expectations surveys.

### APPLICABLE LAW

1. *Federal Rules of Evidence 702 and 703, and Daubert Standard*

■ The court is obligated to serve as gatekeeper where expert opinion evidence is proffered to determine whether expert opinion is grounded in objective underlying scientific methodology as opposed to mere speculation or conjecture. *Daubert,* 509 U.S. at 589–590, 595, 113 S.Ct. 2786 ("focus, of course, must be solely on principles and methodology, not on the conclusions they generate"). *See also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141–142, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The court's obligation is codified in the Federal Rules of Evidence 702 and 703. The applicable rule governing admissibility of testimony by experts is Federal Rule of Evidence 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2)

the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. *See also* Advisory Committee Notes to Rule 702, 2000 Amendments ("A review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.") The applicable rule governing the legitimacy of underlying bases of opinion testimony by experts is Federal Rule of Evidence 703, which provides in part:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

Fed.R.Evid. 703. In other words, expert testimony that can assist the trier of fact is to be admitted at trial where a preliminary assessment finds "the reasoning or methodology underlying the [proffered] testimony is scientifically valid and ... that reasoning or methodology properly can be applied to the fact at issue." *Daubert,* 509 U.S. at 592–593, 113 S.Ct. 2786 (internal footnote omitted). *See also* Fed.R.Evid. 703 at Advisory Committee Notes, 1972 Proposed Rules ("The rule ... offers a more satisfactory basis for ruling upon the admissibility of public opinion poll evidence. Attention is directed to the validity of the techniques employed rather than to relatively fruitless inquiries whether hearsay is involved.").

■ In determining the reliability of the methodology or technique underlying the formation of an expert's opinion (as opposed to the results, conclusion, or opinion

of a scientific endeavor of an expert), the court *may* consider several factors in a flexible manner depending on the particular circumstances of each case, as there are numerous types of expertise. *Kumho Tire,* 526 U.S. at 150–151, 119 S.Ct. 1167. "These factors include: [1] Whether a 'theory or technique ... can be (and has been) tested'; [2] Whether it 'has been subjected to peer review and publication'; [3] Whether, in respect to a particular technique, there is a high 'known or potential rate of error' and [4] Whether there are 'standards controlling the technique's operation'; and [5] Whether the theory or technique enjoys 'general acceptance' within a 'relevant scientific community.'" *Id.* at 150, 119 S.Ct. 1167, *citing Daubert,* 509 U.S. at 592–594, 113 S.Ct. 2786. However, these factors remain uncodified and by no means constitute a "definitive checklist or test." *Id.,citing Daubert,* 509 U.S. at 593, 113 S.Ct. 2786. As such, the court remains mindful that, in carrying out its gatekeeper function through preliminary assessment of the reliability of an underlying methodology serving as the basis of an expert's opinion, it must also root out overly pessimistic or automatic challenges that would otherwise cloud the capabilities of the jury and advocacy system. *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786. Therefore, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.; cf. Kumho Tire,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (affirming expert testimony as inadmissible where expert employed purely subjective conjecture as basis for opinion and where no evidence existed that any other tire expert accepted proffered subjective methodology); *and Oglesby v. General Motors Corp.,* 190 F.3d 244 (4th Cir.1999) (holding expert's opinion inadmissible where based on pure specula-

tion as opposed to accepted methodologies of testing or researching broken pipe).

### 2. Rule of Law on Admissibility of Consumer Expectation Survey Evidence

■ In products liability cases alleging an unreasonably dangerous design defect under Virginia law, direct and circumstantial evidence of reasonable consumer expectations of safety standards is admissible to show defectiveness. *See Alevromagiros v. Hechinger,* 993 F.2d 417, 420–421 (4th Cir.1993), *citing Sexton v. Bell Helmets, Inc.* 926 F.2d 331, 337 (4th Cir.), *cert. denied,* 502 U.S. 820, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991); *quoting Ford Motor Co. v. Bartholomew,* 224 Va. 421, 430, 297 S.E.2d 675, 679 (1982). *See also Blevins v. New Holland North America, Inc.,* 128 F.Supp.2d 952 (W.D.Va.2001); *Redman v. John D. Brush & Co.,* 111 F.3d 1174, 1181 (4th Cir.1997); *McAlpin v. Electric Furnace Co.,* 1996 U.S. Dist. LEXIS 12618 (W.D.Va.1999). "Consumer expectations, which may differ from government or industry standards, 'may be proved from evidence of actual industry practices, knowledge at the time of other injuries, knowledge of dangers, the existence of published literature, and from direct evidence of what reasonable purchasers considered defective at the time.'" *Hambrick v. Ken–Bar Mfg.,* No. 7:01CV00177, 11 (W.D.Va. Feb. 28, 2002), *quoting Sexton,* 926 F.2d at 337. As such, evidence of the level of safety consumers expect from a product may be offered on this issue even where consumers were not previously aware of a specific product defect. *See Jeong v. Honda Motor Co.,* 1998 U.S. Dist. LEXIS 8124, *19–20 (W.D.Va.1998) (where the court noted that the lack of public awareness of the dangers of low speed rollovers did not eliminate a triable issue of fact on consumer expectations.).

Survey evidence is independently admissible at trial where there is a substantial showing of reliability. *Baumholser v. Amax Coal Co.*, 630 F.2d 550, 552 (7th Cir.1980) (affirming judgment for plaintiff and admissibility of expert opinion and opinion poll survey regarding structural damage to homes from blasting). Reliability is based on the following standard for admissibility of opinion survey evidence: (1) the survey was "conducted in accordance with generally accepted survey principles," and (2) "the results are used in a statistically correct manner." *Id.,citing Pittsburgh Press Club v. United States,* 579 F.2d 751 (3d Cir.1978). However, the facts and data of a consumer expectation survey need not be independently admissible at trial in order for an expert to testify as to an opinion based on the otherwise inadmissible survey, so long as the methodology is of a type reasonably relied upon by experts in the field to form opinions or inferences. *Id.,citing* Fed.R.Evid. 703.

Numerous factors may be weighed in determining the reliability of an opinion survey, such as the clarity of survey questions, qualifications of interviewers, and the objectivity of the survey. *See, e.g.,* Federal Judicial Center, *Reference Manual on Scientific Evidence, Reference Guide on Survey Research,* 229–276 (2d ed.2000). Under the admissibility standard, a reliable consumer expectation survey is conducted in accordance with generally accepted principles where methodological techniques are valid. *See* Fed.R.Evid. 703; *Keith v. Volpe,* 858 F.2d 467, 480 (9th Cir.1988), *cert. denied,* 493 U.S. 813, 110 S.Ct. 61, 107 L.Ed.2d 28 (1989); *Zippo Mfg. Co. v. Rogers Imports, Inc.,* 216 F.Supp. 670 (S.D.N.Y.1963). Generally accepted consumer expectation survey principles are incorporated in the following valid methodological techniques as indicated and prepared in a separate survey report (often prepared for the court to aid in its evaluation of a survey's admissibility):

1. the purpose of the survey;

2. a definition of the target population and a description of the population that was actually sampled;

3. a description of the sample design, including the method of selecting respondents, the method of interview, the number of callbacks [if necessary as determined by the survey designer and/or administrator], respondent eligibility or screening criteria, and other pertinent information;

4. a description of the results of sample implementation, including (a) the number of potential respondents contacted, (b) the number not reached, (c) the number of refusals, (d) the number of incomplete interviews or terminations, (e) the number of noneligibles, and (f) the number of completed interviews;

5. the exact wording of the questions used, including a copy of each version of the actual questionnaire, interviewer instructions, and visual exhibits;

6. a description of any special scoring (e.g., grouping of verbatim responses into broader categories);

7. estimates of the sampling error, where appropriate (i.e., in probability samples);

8. statistical tables clearly labeled and identified as to source of data, including the number of raw cases forming the base for each table, row, or column; and

9. copies of interviewer instructions, validation results, and code books.

*Reference Manual on Scientific Evidence* 270–71, n. 158 (internal footnote citations omitted). "The completeness of the survey report is one indicator of the trustworthiness of the survey and the professional-

ism of the expert who is presenting the results of the survey." *Id.* at 270. *See also id.* at 238–39, 246, 248. It is not necessary that each available technique be used to conduct and analyze a survey in order for the methodology to be valid, reliable and generally accepted within the survey science community. *Id.* at 270.

■ Importantly, and specifically at issue in the case currently before the court, is the rule that alleged technical or methodological deficiencies in the content or manner in which a survey was conducted, such as "slanted, leading and ambiguous" survey questions, bears on the weight, and not the admissibility of a survey provided that the survey topic is relevant, i.e., material and probative to the issue and facts of a particular case. *See, e.g., Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.,* 82 F.3d 1533, 1546 n. 9 (10th Cir.1996), *citing Brunswick Corp. v. Spinit Reel Co.,* 832 F.2d 513, 522 (10th Cir.1987). *See also Harolds Stores, Inc.,* 82 F.3d at 1544 ("Technical and methodological deficiencies in the survey, including the sufficiency of the universe sampled, bear on the weight of the evidence, not the survey's admissibility."), *citing Brunswick,* 832 F.2d at 523 and n. 6; *Keith,* 858 F.2d at 480; *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833, 844–45 n. 24 (11th Cir.1983).

## LEGAL ANALYSIS

### I. CONSUMER EXPECTATION SURVEY EXPERTS: ADAMS AND KIECKER

Tunnell has offered Adams and Kiecker as experts on survey research. Both Adams and Kiecker conducted consumer expectation survey research regarding battery disconnects specifically prepared and analyzed for the plaintiff in this litigation. Adams is to opine that, based on the results of the consumer expectation survey conducted between April 2003, and October 2003, most consumers (61%) would have paid for and expected motor vehicle manufacturers to equip vehicles with battery disconnects in 1999 to prevent post-collision fires. Pl.'s Mem. Opp'n Ford's Daubert Mot. Exclude Test. Dr. Adams at 14–15. Kiecker is to opine that, based on the results of the consumer expectation survey she conducted between January 29, 2004, and February 29, 2004, most consumers (80.6%) would have expected motor vehicle manufacturers to incorporate battery disconnects in 1999 to prevent post-collision fires, even though the government did not require it. Def.'s Mem. Supp. Mot. Exclude Test. Pamela Kiecker, Ex. C, at 6. Ford moves to exclude the testimony of Adams and Kiecker as unreliable and biased, and therefore inadmissible under Federal Rules of Evidence 702 and 703 and *Daubert* on the basis that Adams' and Kiecker's surveys were improperly designed and administered, and were retrospective for which there is no generally accepted standard. Def.'s Mem. Supp. Mot. Exclude Test. Dr. Adams at 8, 13 and 16.

> *A. Tunnell's survey expert Dr. Marjorie E. Adams is qualified to testify and her testimony is presently deemed reliable and admissible under Daubert and Federal Rules of Evidence 702 and 703.*

Ford argues in sum, that under the *Daubert* factors, Adams' underlying methodology forming the basis of her opinion is not generally accepted in the scientific survey community and is biased; therefore, it is unreliable. Def.'s Mem. Supp. Mot. Exclude Test. Dr. Adams at 8, 13 and 16. Significant to Ford's Daubert challenge is that Adams' methodology and survey results are biased because Adams (1) had no contact with the interviewers prior to administration of the survey; (2) did not monitor any portion of the survey; (3) did

not compare the work of one interviewer (David Barrett) to the other's (Kim Sandridge); (4) only "spot" checked the data; and (5) the response rate and target population were not trustworthy making Adam's testimony problematic and speculative. *Id.* at 16. Ford places great reliance on its argument that the survey was improperly designed because Tunnell's attorneys assisted in drafting an information piece that was included in the survey with the purpose of educating respondents on "safety devices" that included a battery disconnect, thereby creating bias and consumer expectations that did not previously exist in 1999. *Id.* at 10. Therefore, instead of simply asking consumers what their expectations were regarding safety devices in general in 1999, Ford argues that Adams educated consumers on a hypothetical situation involving battery disconnects and created consumer expectations that automobile manufacturers should have installed battery disconnects on vehicles when consumers had not so much as even known such devices existed. In other words, according to Ford, the survey was seriously flawed in that the information piece was essentially Tunnell's counsel's opening argument, rendering the survey biased and unreliable.

Adams' expert opinion testimony is admissible. In accordance with Rules 702, 703 and *Daubert* standards generally governing expert testimony, the *Reference Manual on Scientific Evidence* details specific expertise requirements for survey experts and provides that experts who design, conduct, or analyze a survey be appropriately skilled:

> Experts prepared to design, conduct, and analyze a survey generally should have graduate training in psychology (especially social, cognitive, or consumer psychology), sociology, marketing, communication sciences, statistics, or a related discipline; that training should include courses in survey research methods, sampling, measurement, interviewing, and statistics. In all cases, the expert must demonstrate an understanding of survey methodology, including sampling, instrument design (questionnaire and interview construction), and statistical analysis. Publication in peer-reviewed journals, authored books, membership in professional organizations, faculty appointments, consulting experience, research grants, and membership on scientific advisory panels for government agencies or private foundations are indications of a professional's area and level of expertise. In addition, if the survey involves highly technical subject matter (e.g., developmentally disabled adults with limited cognitive skills), the survey expert also should be able to demonstrate sufficient familiarity with the topic or population (or assistance from an individual on the research team with suitable expertise) to design a survey instrument that will communicate clearly with relevant respondents.

*Reference Manual on Scientific Evidence* at 238. *See* Fed.R.Evid. 702–703; *Daubert*, 509 U.S. at 592–594, 113 S.Ct. 2786. Adams' qualifications and relevant experience in survey research and design, and products marketing are significant. Pl.'s Opp'n Ford's Daubert Mot. Exclude Test. Dr. Adams at Ex. B, Attachment 4, curriculum vita. She has earned a B.A. in Mathematics and Economics, an M.B.A. with concentration in Marketing and Statistics from the University of Chicago, and a Ph.D. in Marketing from the University of Pennsylvania. She has taught at numerous universities, published numerous articles, and held numerous professional positions in product and market research and analysis that has involved survey development, administration and analysis over the past twenty-six years. *Id.* at 2 and Attachment 4. Adams is cur-

rently supervising a large scale survey and responsible for survey development, administration, and responses at the Product Development & Management Association. *Id.* Furthermore, despite the technical subject matter of the function of battery disconnects, the population surveyed was simple as respondents were those who were (1) over twenty-two years of age, and thus it was possible that they were potential automobile consumers in 1999, .and (2) had been a passenger in a car. Def.'s Mot. Summ. J., Ex. B, Survey Report, 5. As such, in accordance with the *Reference Manual on Scientific Evidence,* Adams is knowledgeable on the consumer population and limited target population of respondents of the survey to analyze the data results in an appropriately skilled and experienced manner. Nevertheless, Adams conducted research on battery disconnects and received assistance on the technical aspects of battery disconnects from Tunnell's attorneys, but only in so far as understanding the information piece containing a description and function of battery disconnects is concerned. Thus, Adams' experience and expertise is directly relevant to her qualifications as a consumer expectations survey expert in this case.

Adams' underlying methodology forming her opinion, the survey and its results, is admissible as any alleged technical or methodological defects goes to weight of the evidence and not admissibility of the survey. *See, e.g., Harolds Stores, Inc.,* 82 F.3d at 1544; *Keith,* 858 F.2d at 480; *Baumholser,* 630 F.2d at 552 (internal citations omitted); *United States Surgical Corp. v. Orris, Inc.,* 983 F.Supp. 963, 967–968 (D.Kan.1997) ("sufficiency of the sample universe is relevant to the weight and not the admissibility of the survey"). Adams' stated survey purpose was "to understand consumer expectations related to the use of battery disconnects on automobiles to prevent a post-collision fire." Def.'s Mem. Law Supp. Mot. Exclude Test. Dr. Marjorie Adams, Ex. C, Survey Report, at 1. In accordance with generally accepted survey principles, and as set forth in the *Reference Manual on Scientific Evidence,* Adams used expert methodology to design her survey so that respondents were easily identified in a non-probability mall intercept, had a stated clear purpose to poll consumer expectations, developed questions that were relevant to the purpose of the survey, and analyzed the results accounting for error. Def.'s Mem. Law Supp. Mot. Exclude Test. Dr. Marjorie Adams, Ex. C, Survey Report. Furthermore, Adams used the *Reference Manual on Scientific Evidence* as her primary guide in designing her survey, analyzing data results, and preparing a survey report that succinctly accounts for the nine indicia of valid methodological survey techniques available for experts to use. *See Reference Manual on Scientific Evidence* at 270–271; Def.'s Mem. Law Supp. Mot. Exclude Test. Dr. Marjorie Adams, Ex. C, Survey Report. Adams' survey was conducted in a scientifically well-recognized double-blind manner to ensure objectivity of the survey. In the expert survey science community, a blind survey is recommended to avoid bias and is described as a survey conducted in such a manner that "the interviewers and respondents [are] blind to the purpose and sponsorship of the survey and ... attorneys [are excluded] from any part in conducting interviews and tabulating results." *Reference Manual on Scientific Evidence* at 238. Adams survey was double-blind because she did not administer or train the interviewers personally, but had an experienced consumer expectations survey administrator (also retained by Tunnell, Alden Bigelow) hire a survey marketing company that administered and provided experienced and trained interviewers who were blind to

the purpose and sponsorship of the survey. Pl.'s Opp'n Mot. Exclude Dr. Adams, Ex. B, Survey Report, 2–3. *See also Karan v. Nabisco, Inc.*, 82 F.R.D. 683, 685 (W.D.Pa.1979) (discussing appropriate administration of blind survey by hired survey company for defendant employer in preparation for litigation of class action employment suit).

Additionally, involvement of Tunnell's counsel in drafting an initial information piece, that Adams then perfected, to ensure Adams' survey was relevant to its purpose is generally accepted practice and does not automatically taint the survey as biased and inadmissible as Tunnell's counsel did not participate in any part of conducting the survey, and furthermore, questions of valid techniques are for the trier of fact. The *Reference Manual on Scientific Evidence* regarding attorney involvement in consumer expectations surveys states,

> [S]ome attorney involvement in the survey design is necessary to ensure that relevant questions are directed to a relevant population. The trier of fact evaluates the objectivity and relevance of the questions on the survey and the appropriateness of the definition of the population used to guide sample selection. These aspects of the survey are visible to the trier of fact and can be judged on their quality, irrespective of who suggested them. [A]ny potential bias is minimized by [conducting blind surveys].

*Reference Manual on Scientific Evidence* at 237–238 (internal footnote citations omitted). Adams consulted with Tunnell's counsel and used their draft of the information piece to ensure she designed a relevant survey in accordance with the recommendations of the reference manual regarding surveys. *Id.* Given that Adams was retained by Tunnell's counsel for the purposes of conducting a consumer expectations survey as direct evidence in furtherance of this litigation, it was appropri-

ate for Adams to consult with Tunnell's counsel and to use the draft information piece written by counsel as a basis for the final background information piece on battery disconnects that Adams wrote as part of the survey.

Similarly, Ford's assertion that Adams' survey created consumer expectations where none existed in 1999, because consumers had to be informed of the nature of battery disconnects via the information piece, does not affect the survey's admissibility. *See Jeong*, 1998 U.S. Dist. LEXIS at \*19–20; *Hambrick*, No. 7:01CV00177 at 11. In order for consumers to respond to the survey questions, and for the survey to be relevant to the facts and issues of this litigation, the information piece served to inform consumers regarding the specific safety device about which the respondents were asked to provide their consumer expectations. Simply because the consuming public may not have been generally aware of a technological advance that was available, feasible, and known to the industry to remedy a known hazard, does not mean that a reasonable consumer would not have expected such a device be installed in 1999 once informed of its existence. As *Jeong* teaches, that question is for the jury to decide. No manufacturer can ignore such a safety device and credibly argue later that consumers had no expectation of the implementation of such a device simply because they were not aware of its existence. Such a construction of the third prong of *Alevromagiros* would impose a virtually impossible burden on products liability plaintiffs in cases such as this and encourage manufacturers to keep product safety innovations under wraps, which is clearly contrary to sound public policy. The issue under the third prong of *Alevromagiros* is whether a reasonable consumer would have expected a battery disconnect device on a car in 1999, and that question is for the jury to determine. The Adams

and Kiecker surveys are designed to assist the jury in deciding this question. Since Adams' survey report reveals a substantial showing of reliability, her survey is admissible and any deficiency regarding the creation of consumer expectations because of the information piece is an issue for the trier of fact. *See, e.g., Baumholser*, 630 F.2d at 552.

Finally, the retrospective nature of Adams' survey in polling opinion in 2003, concerning consumer expectations in 1999, is accepted methodology and does not affect the survey's admissibility. Ford's own rebuttal witness, Dr. Dana–Nicoleta Lascu, admitted in deposition that she misquoted authority in her Rule 26 report to purport that retrospective surveys are not valid surveys. Indeed, retrospective consumer expectations surveys are common practice and the cited authority contained in Dr. Lascu's report provides that retrospective surveys are generally accepted in the expert survey community. Dana–Nicoleta Lascu, Ph.D., Analysis of the Marjorie Adams and the Pamela Kiecker Research Reports dated April 15, 2004, 1–2; Lascu Dep. 35–36. *See also, Reference Guide on Scientific Research* at 235. Ford is also wrong to argue that Adams' survey should be rejected as impermissibly biased because (1) it failed to inform respondents that the government did not require battery disconnects on automobiles in 1999, and (2) because it failed to educate respondents that critical circuits would be cut off in emergency situations such as post-collision fires if a battery disconnect was incorporated in automobiles, thereby leaving respondents no actual survey choice, other than to burn or not to burn. Lascu Dep. 62. Review of Adams' survey reveals that question 22 specifically informed respondents that battery disconnects were not required by the government, and her survey was specifically based on a hypothetical situation where a battery disconnect would leave critical circuits on, such as

power windows or doors in order to avoid influencing respondents answers. Pl.'s Opp'n Mot. Exclude Dr. Adams, Ex. B, Survey Report, 14. Regardless, any technical deficiencies in Adams survey are for the trier of fact. *See, e.g., Harolds Stores, Inc.*, 82 F.3d at 1544.

Thus, Adams' report was properly designed, administered, and analyzed in accordance with generally accepted survey principles in effort to achieve reliable and objective results. Adams expert opinion is grounded in valid consumer expectations survey methodology. Any remaining questions concerning methodological technical deficiencies are properly the subject of cross-examination at trial.

*B. Tunnell's survey expert, Dr. Pamela Kiecker, is qualified to testify and her testimony is presently deemed reliable and admissible under Daubert and Federal Rules of Evidence 702 and 703.*

Ford argues that because Kiecker used the identical information piece in her survey as Adams, Kiecker's survey is biased for the same reasons as Adams'—Tunnell's counsel primarily drafted the information piece and is reflective of counsel's opening argument. Def.'s Mem. Supp. Mot. Exclude Test. Pamela Kiecker at 2–3. Ford reasons that because Kiecker did not verify the facts in the information piece, her survey lacks objectivity and is biased. *Id.* at 10. Furthermore, Ford asserts that because Kiecker's opinion is based solely on the responses of 201 survey participants, the survey is tailored to reflect Tunnell's counsel's case theory and is therefore unreliable. *Id.* at 3. Ford also argues that because Kiecker had no prior knowledge of battery disconnect devices, had not previously designed or administered a retrospective survey prior to this litigation, she lacks specific survey expertise and

does not qualify as a survey expert in this case in accordance with Fed.R.Evid. 702. *Id.* at 5, 10. Finally, Ford argues that because the nature of the survey is retrospective to 1999, it does not fall within generally accepted survey principles.

Kiecker's expert opinion testimony is admissible. Kiecker's qualifications and expertise meet the general standards for expert testimony set forth under Rules 702, 703 and *Daubert*, and also meets the detailed requirements for survey experts as set forth in the *Reference Guide on Survey Research*. *See* Fed.R.Evid. 702–703; *Daubert*, 509 U.S. at 592–594, 113 S.Ct. 2786; *Reference Manual on Scientific Evidence* at 238. Kiecker's qualifications and relevant experience in consumer research and design, and survey and marketing are significant. Pl.'s Opp'n Ford's Daubert Mot. Exclude Test. Dr. Adams at Ex. C, Consumer Expectation Study Report of Findings, Appendix G, Curriculum Vitae— Pamela Kiecker, Ph.D. Kiecker received her M.B.A. from Minnesota State University and her Ph.D. in Business Administration from the University of Colorado with a major in Marketing, a minor in Social Psychology and a dissertation titled, *Some Causes and Consequences of Interviewer Cheating Behavior in Survey Research.* Kiecker has held numerous professorships and research positions at numerous universities, participated in numerous professional conferences and published extensively in consumer and marketing science and analysis over the past twenty-one years. *Id.* Kiecker currently holds the position of Head of Research and Issue Analysis at Royall & Company. *Id.* Thus, Kiecker's experience and expertise is directly relevant to her qualifications as a consumer expectations survey expert in this case.

Kiecker's underlying methodology, the survey and its results, is admissible as any alleged technical or methodological deficiencies go to the weight of the evidence, and not the admissibility of the survey. *See, e.g., Harolds Stores, Inc.,* 82 F.3d at 1544; *Keith,* 858 F.2d at 480; *Baumholser,* 630 F.2d at 552; *Orris, Inc.,* 983 F.Supp. at 967–968. Keicker's use of the same information piece, drafted by Tunnell's counsel and finalized by Adams, does not hinder the admissibility of Keicker's survey or establish bias. *Reference Manual on Scientific Evidence* at 237–238. Based on the same reasoning upon which the court finds Adams' survey admissible herein, the court finds Kiecker's survey admissible. As is the case with Adams, Tunnell's counsel did not participate in conducting or analyzing any portion of Kiecker's survey. Any possible defect as a result of slanted, leading, or otherwise biased language in the information piece or questions bears on the weight of the evidence and not the admissibility of the survey. As such, Kiecker's use of the same information piece is generally accepted practice among survey experts. *Id. See also, e.g., Keith,* 858 F.2d at 480 ("Technical inadequacies in the survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility.").As the court reasoned above, Kiecker is an expert in the area of consumer expectations and surveys. Ford argues that Kiecker's survey is inadmissible because she had not previously conducted a retrospective survey as she did for this litigation. The fact that Kiecker had not designed this specific type of retrospective survey, or that she had no previous knowledge of battery disconnects prior to being retained by Tunnell, has no bearing on the admissibility of her survey evidence, or her opinion testimony. *See, e.g., Orris, Inc.,* 983 F.Supp. at 967–968 (affirming magistrate judge's denial of defendant's motion to exclude expert testimony because deficiencies in testimony and survey

go to the weight of evidence rather than admissibility) ("The Tenth Circuit upheld the admission of the [expert] testimony because 'an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight.' "), *citing Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir.1991). Kiecker is a consumer expectations survey expert. Kiecker consulted with Tunnell's counsel regarding background information, the information piece Adams used in her survey, and battery disconnects in general prior to designing and administering her survey in order to ensure its relevancy to the issues at hand and purpose of the survey. Kiecker's actions were thus within generally accepted survey principles according to the *Reference Guide on Survey Research. Reference Manual on Scientific Evidence* at 237–238, 270–271; *See* Def.'s Mot. Exclude Test. Pamela Kiecker, Ex. C, Consumer Expectation Study Report of Findings.

Moreover, Kiecker's survey report details her survey methodology. *See* Def.'s Mot. Exclude Test. Pamela Kiecker, Ex. C, Consumer Expectation Study Report of Findings. Kiecker used expert methodology to design, administer and train interviewers to conduct a double-blind survey—interviewers and respondents were blind to the purpose and sponsorship of the survey. Def.'s Mot. Exclude Test. Pamela Kiecker, Ex. C, Consumer Expectation Study Report of Findings, 4–5. Kiecker conducted pre-tests, designed her survey so that respondents were easily identified in a non-probability mall intercept, had a stated clear purpose to poll consumer expectations, a defined sample group based on criteria that participants be English-speaking Virginia residents over the age of twenty-four that had either been a driver or passenger in an automobile in 1999, developed questions that were relevant to the purpose of the survey, and analyzed the results accounting for error. *See* Def.'s Mot. Exclude Test. Pamela Kiecker, Ex. C, Consumer Expectation Study Report of Findings. Kiecker used the *Reference Guide on Survey Research* as her primary guide in designing her survey, analyzing data results, and preparing a survey report that succinctly accounts for the nine indicia of valid methodological survey techniques available. *See Reference Manual on Scientific Evidence* at 270–271; Def.'s Mot. Exclude Test. Pamela Kiecker, Ex. C, Consumer Expectation Study Report of Findings.

In sum, Kiecker's survey was conducted in a scientifically well-recognized manner to ensure objectivity and relevancy to the purpose of the survey—"to determine what consumers expectations were in 1999 regarding automobile manufacturers' use of automobile battery disconnects designed to prevent post-collision fires." *Id.* at 4. Furthermore, just as Adams did, Kiecker informed respondents that no government standards existed regarding battery disconnects. *Id.* at 12. Ford's assertion that Kiecker's survey is inadmissible because she only surveyed 201 participants is wrong. The fact that Kiecker surveyed 201 participants is an alleged technical defect that bears on the weight of evidence only. *See, e.g., Harolds Stores, Inc.*, 82 F.3d at 1544. Additionally, Ford's assertion that Kiecker's survey is inadmissible because the survey was retrospective to 1999 is wrong for the same reasons as the court discussed Ford was wrong regarding Adams' survey; Ford's rebuttal expert, Dr. Lascu's proposition that retrospective surveys are generally unreliable is not supported by the authority she cites in her Rule 26 report, but stands for exactly the opposite proposition that retrospective surveys are generally accepted and reliable. Pl.'s Opp'n Ford's Daubert Mot. Exclude Dr. Adams at 28–29; Lascu Dep. 35–36. *See also Hambrick*, No. 7:01CV00177 at

11; *Jeong,* 1998 U.S. Dist. LEXIS at *19–20. Ford's alleged methodological defect in this regard goes to the weight of evidence, not admissibility. *Harolds Stores, Inc.,* 82 F.3d at 1544. As Kiecker's survey report reveals that her survey is substantially reliable, any further assertions by Ford set forth in its motion to exclude the testimony of Kiecker regarding methodological or technical deficiencies do not affect the admissibility of Kiecker's survey, but the weight of the evidence before the trier of fact. *Id.*

## II. FIRE ORIGIN AND ENGINEERING EXPERTS: CRIM, MCKNIGHT, AND WALLINGFORD

A. *Charles Crim, Professional Engineer and Certified Fire Investigator, is qualified to testify as to the origin of the fire and his opinion is sufficiently reliable to be admitted under Daubert and Federal Rules of Evidence 702 and 703.*

■ Charles C. Crim, P.E., was retained to investigate the cause and origin of the fire in the 1999 Mustang GT shortly after the accident on November 18, 1999. Crim, a Senior Engineer with Froehling & Robertson, Inc., has been doing fire investigations for nearly twenty years. Crim conducted a field examination of the Mustang on December 7, 1999, and performed subsequent laboratory examination of certain wires from the dashboard of the Mustang. Crim stated that he followed the protocols of NFPA 921 *Guide for Fire & Explosion Investigations,* and determined that the fire started in the electrical system components in the dashboard based on physical evidence which also tended to rule out the engine compartment, fuel system, exhaust system components and other potential sources of ignition. Crim also considered the eyewitness statements of persons at the scene of the fire and later examined the depositions of such persons. Crim concluded as follows:

> Our original hypothesis that this fire originated in the dashboard and was caused by crash damage to the wiring harness and accessory wiring has been proven through the process of eliminating all other known ignition sources for motor vehicle fires. Therefore, it is our opinion that the origin of the fire was within the dash of the vehicle and that the cause of the fire was the crush damaged wiring harness and accessory wiring.

Letter Opinion of Charles Crim dated December 10, 2003, at 6.

Ford objects to the opinion testimony of Charles Crim, claiming that he is not an electrical engineer or auto design expert and therefore is not qualified to render electrical engineering opinions. Ford also claims that Crim's opinions are not based on any empirical data or recognized electrical engineering methods. Ford also claims that Crim has done no testing, has not seen or relied upon any wiring diagrams or wiring specifications, and has not examined an undamaged 1999 Mustang GT or exemplar wiring harness. Ford claims that Crim's opinion has not met with general acceptance in the scientific community, is not subject to publication or peer review, was created for litigation, and is not subject to any calculable error rate.

Ford's objections to Crim's testimony are meritless. Although not an electrical engineer, Crim is a senior engineer with the Froehling and Robertson engineering firm and has been a Certified Fire Investigator for nearly two decades. Crim has taught courses to Virginia State Police troopers on mechanical, electrical and material failures leading to fire. Crim has provided expert testimony as to fire origin in many courts in Virginia, Maryland, North and South Carolina, and the District of Columbia. Crim clearly is qualified to

give an opinion as to the origin of the fire in this case.

Ford contends that Crim did not examine an exemplar 1999 Mustang or wiring harness and examined no wiring drawings or specifications. However, Crim painstakingly examined the 1999 Mustang GT involved in this accident and described in his deposition the layer by layer examination he made of the fire damage. Crim performed a detailed physical examination of the burn patterns in the car which caused him to rule out the presence of any accelerant as there were no burn patterns suggestive of "pour patterns," "ponding," or "puddling" of a liquid combustible. Crim further examined the testimony of eyewitnesses to rule out other causes, whose testimony confirmed Crim's opinion as to the source of the fire origin as they stated that the fire started in the dashboard, and the only source of ignition in the dashboard was the crushed wires. He described further that he took certain wiring from the car and examined it at a lab in Richmond under a stereoscope, all of which yielded his opinion that the fire was caused by resistance heat from the dashboard wiring. Thus, this is not a situation as in *Kumho Tire,* where the expert expressed his opinion as to the cause of tire failure based on his own two factor test rather than any accepted methodology and after first examining the tire in question on the morning of his deposition. Crim followed the NFPA 921 methodology and applied it to the facts of this case based on his own timely and detailed examination of the 1999 Mustang GT.

Ford also claims that Crim's opinion is not admissible because Crim did no testing. But *Daubert* does not require an expert to perform testing before his opinion is admissible. Rather, *Daubert* requires that the expert's methodology be established, scientifically sound, and subject to testing and peer review. That is

clearly the case with Crim's opinion as he testified that he employed the fire origin methodology spelled out in the definitive fire origin standard published by the National Fire Prevention Association, Inc.'s NFPA 921 *Guide for Fire and Explosions Investigations.* Throughout his deposition testimony, Crim described his methodology in determining the origin of the fire as following the guidelines of NFPA 921. Many courts have recognized NFPA 921 as "a peer reviewed and generally accepted standard in the fire investigation community." *Travelers Prop. & Cas. Corp. v. Gen. Elec. Co.,* 150 F.Supp.2d 360, 366 (D.Conn.2001); *Royal Inc. Co. v. Daniel,* 208 F.Supp.2d 423 (S.D.N.Y.2002).

Based on the criteria set forth in *Daubert* and Federal Rule of Evidence 702, the testimony of Crim as to the origin and cause of the fire qualifies as reliable testimony. Crim's testimony was based on his investigation of the cause of the fire, an investigation which was conducted in accordance with the professional standards and scientific methodology used by experts in fire and explosion investigations, and set forth in NFPA 921.

A comparison of Crim's methodology and the NFPA 921 methodology reveals that his conclusions were based on these recognized standards and not merely his subjective belief. *See Daubert,* 509 U.S. at 589–90, 113 S.Ct. 2786 ("The subject of an expert's testimony must be 'scientific' ... knowledge. The adjective 'scientific' implies a grounding in the methods and procedures of science. Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation."). Therefore, Crim's testimony satisfies the standard of reliability under *Daubert* and Fed.R.Evid. 702.

In following the NFPA 921 methodology, Crim determined that it was necessary to ascertain the cause of the fire. He then defined the problem and collected and ana-

lyzed the data including his field and laboratory examinations, reviewed eye witness accounts, read depositions and considered data collected by Ford's expert, Andrew Neuhalfen. Crim then analyzed the data and developed his hypothesis that the fire was caused by crush damage to the wiring in the dashboard. Finally, in developing his hypothesis, Crim relied on deductive reasoning, a method recognized as "scientific," and identified all of the potential ignition scenarios. By physically examining the vehicle, Crim was able to rule out a fire caused by an accelerant or a fire originating in the engine compartment, fuel system, exhaust system, or any other sources of fire.

Based on this logical analysis coupled with Crim's extensive professional experience as a fire investigator, Crim's conclusion passes the threshold of admissibility mandated under *Daubert* and Fed.R.Evid. 702. Of course, at trial Ford may challenge the degree of credibility the jury ought to accord Crim's conclusion and present counter-evidence to refute the scientific veracity of Crim's hypothesis.

As such, the court finds that Crim's testimony is the product of reliable principles and that he has applied these principles and methods to the facts of this case in a reliable manner. Crim's testimony clearly is relevant because it directly explains the cause of the fire. Therefore, the court finds that Crim's testimony has sufficient reliability and relevancy to satisfy the admissibility requirements of *Daubert* and Fed.R.Evid. 702.

B.  *Samuel McKnight, Electrical Engineer, is qualified to testify as to the origin of the fire and his opinion is sufficiently reliable to be admitted under Daubert and Federal Rules of Evidence 702 and 703.*

██  The same is true with Tunnell's fire origin expert Samuel McKnight.

While Ford challenges the qualifications of Crim because he is a fire origin expert and not an electrical engineer, Ford contends that McKnight is not qualified for just the opposite reason. As was true with Crim, McKnight is qualified to render an expert opinion as to the source of the fire in the 1999 Mustang GT and his opinion is both relevant and scientifically reliable.

McKnight has a B.S. and M.S. degree in electrical engineering and a Ph.D. in physics from Duke University. After teaching college for a few years, McKnight has worked as an independent consultant for the last quarter century, working in areas involving electricity including fire and explosion analysis. McKnight has testified as an expert witness in courts in Virginia, the Carolinas and other states.

As with Crim, Ford does not dispute the applicability of NFPA 921 or McKnight's adherence to its precepts. Rather, Ford claims that McKnight is not qualified, that his opinions are not based in scientific facts and data, are not derived from a scientific methodology, that he has done no testing, that his opinions are not subject to peer review, and were developed especially for this litigation. The problem with Ford's complaints in large measure is that they ignore the fact that the NFPA 921 methodology was employed by McKnight and has been determined to be a reliable methodology for determining fire origin. The specific bases for Ford's complaints—that McKnight has not seen an exemplar 1999 Mustang or wiring harness, cannot identify which circuits were on and may have been responsible for the fire, did not know the speeds and forces involved in the accident, had no data regarding ignition temperatures and fire resistance properties of the wiring and insulation materials in the Mustang's dash, had not ascertained which circuits were cut by the blown fuses,

and did not find any physical evidence of electrical activity—are proper subjects for contrary expert testimony and cross-examination, but do not rise to the level warranting exclusion of McKnight under *Daubert*.

As with Crim, what is telling with regard to the admission of McKnight's opinion is the complete picture of the process McKnight employed to render his opinion. When considered in total, McKnight's opinion clearly meets the *Daubert* test. McKnight investigated the cause and origin of the fire in the 1999 Mustang GT by inspecting the vehicle itself, reviewing photographs and reports prepared by others, reading depositions of eyewitnesses, reviewing the wiring diagrams of the 1999 Mustang GT and treatises of fire investigation methodology. Considering this information, McKnight applied the methodology in Chapters 2 and 16 of NFPA 921 and ruled out other sources of the fire. *See* NFPA 921 §§ 2.1–2.5 and 16.2.5. McKnight ruled out the engine as the source of the fire as there was no fire damage in the area of the engine. As there was no fire in the engine compartment and no gasoline in the passenger compartment, McKnight concluded that gasoline was not ignited in the fire. Nor was there any other combustible liquid or testimonial or physical evidence of the use by Tunnell or Athey of other sources to ignite it such as a cigarette, matches or cigarette lighter. Neither Jinright or Weaver observed the fire start in a seat inside the passenger compartment. Rather, both placed the first observations of the fire inside the dash where the wiring is located. In Chapter 22, NFPA 921 identifies three electrical sources of fire which can ignite insulation and other such materials: (1) unintended high resistance faults, (2) electrical arcing, and (3) lamp filaments of broken bulbs. *See* NFPA 921 at §§ 22.4.2.1; 22.4.2.2 and 22.4.2.3. McKnight ruled out electrical arcing as

there was no physical evidence of same and there is no suggestion that filaments of broken bulbs were a source of this fire. Based on this analysis, McKnight concluded that the source of the post-collision fire in the 1999 Mustang was a high resistance fault as reflected in NFPA 921 §§ 6.9.6 and 22.4.2.1, which states:

> High-resistance faults are long-lived events in which the fault current is not high enough to trip the circuit overcurrent protection, at least in the initial stages. A high-resistance fault on a branch circuit may be capable of producing energy sufficient to ignite combustibles in contact with the point of heating. It is rare to find evidence of a high-resistance fault after a fire.
>
> * * * * * *
>
> Unintended high-resistance faults in wiring can raise the conductor temperature to the ignition point of the insulation, particularly in bundled cables such as the wiring harnesses or the accessory wiring under the dash, where the heat generated is not readily dissipated. This can occur without activating the circuit protection.

Applying the NFPA 921 methodology, McKnight identified high resistance faults caused by crash damaged wires as the cause of the fire, and it is recommended that his opinion satisfies the requirements of *Daubert* and Fed.R.Evid. 702.

### C. *Jerry Wallingford, Mechanical Engineer, may render some, but not all, of the opinions he proffers.*

██ Ford moved as well to exclude all of the opinions of Tunnell's expert Jerry Wallingford. Based on his education, training and experience, Wallingford is qualified to render some opinions and may testify as follows: (1) Cause and origin of the fire in the 1999 Mustang GT; (2) Feasibility and availability of battery discon-

nect devices prior to 1999; (3) The design and installation of battery disconnect devices in an exemplar 1999 Mustang GT; (4) The 1999 Mustang GT lacking battery disconnect devices was unreasonably dangerous; and (5) The absence of battery disconnect devices was the proximate cause of the fire.

As regards cause and origin of the fire, Ford's motion as to Wallingford parrots the motions as regards Crim and McKnight. In that regard, Ford claims that Wallingford is neither qualified, nor did sufficient testing or appropriate investigation to form an opinion regarding the origin of the fire. As with Crim and McKnight, Ford is wrong. Wallingford is a Professional Engineer with over 40 years of experience and a member of the Society of Automotive Engineers. He has had training on NFPA 921 and has performed fire cause and origin investigations. Like Crim and McKnight, he applied the well established NFPA 921 methodology and aptly applied it to the facts of this case. Although his testimony may well be cumulative, Wallingford has sufficient experience and qualifications to testify as to the origin of the fire.

■ In addition, Ford claims that Wallingford cannot render opinions (2) through (5) noted above, but again misses the mark. By virtue of his education, training and experience, Wallingford is qualified to render mechanical engineering opinions regarding the design and installation of battery disconnect devices in an exemplar 1999 Mustang GT. Further, based on his study of existing literature, depositions and other evidence, Wallingford may testify as to the feasibility and availability of such devices in 1999. As noted below, while it is not an appropriate subject for expert testimony for Wallingford to opine as to the state of Ford's knowledge or its intention or motivation in taking or not taking certain steps, Wall-

ingford certainly can base his feasibility/availability and unreasonably dangerous opinions on the state of Ford's and the industry's knowledge, investigation, study and testing of battery disconnect devices in accordance with Fed.R.Evid. 703. Not only has Wallingford studied National Highway Traffic and Safety Administration ("NHTSA"), Ford and industry literature regarding availability and testing of battery disconnect devices dating back to the 1970s, he installed a battery disconnect system in an exemplar 1999 Mustang GT using the same switch Ford uses to disconnect the fuel pump in the case of impact and other commercially available components. Wallingford also subjected his design to certain limited testing. While Ford questions the adequacy of Wallingford's testing, that issue is the subject of cross-examination and argument at trial. Similarly, pursuant to Rule 703, Wallingford also may opine as to whether the 1999 Mustang GT was unreasonably dangerous when it left Ford's hands based on his qualifications, investigation and study of industry, government and Ford literature regarding post-collision fires and battery disconnect devices. Wallinger also may opine as to whether the passenger compartment fire would have occurred had his battery disconnect system been installed. In sum, therefore, Wallingford may offer opinions I, II, VIII and IX as these opinions clearly meet the *Daubert* and *Kumho Tire* tests for reliability.

On the other hand, there are several opinions which Wallingford proposes to offer which are not, in and of themselves, an appropriate subject of expert engineering opinion. As noted previously, while Wallingford may testify as to his opinion as to feasibility and availability of battery disconnect systems, he may not state, as expert opinions, the state of Ford's knowledge or motivation regarding battery disconnect systems. Thus, Wallingford may

not testify in the form of an expert opinion that Ford has known of the danger of crash damaged wires and the availability of battery disconnect systems to eliminate the hazard. Nor may he offer expert opinions as to Ford's engineering choices or motivation. Such evidence may well be admissible through other direct and circumstantial means, but Wallingford has no qualifications, nor is there any appropriate scientific methodology to test or measure the reliability of his opinions as to what Ford knew, did or did not do, or its motivation. As those opinions are set forth in his December 12, 2003 expert report, Wallingford may not express expert opinions III, IV, V, VI, and VII. He may, of course, rely on documents and other evidence as to Ford's knowledge and actions in connection with, and as bases for those opinions he may render, particularly as regards his feasibility/availability and unreasonably dangerous opinions.

Finally, Ford challenges Wallingford's opinion regarding certain "other similar incidents." Wallingford examined certain data collected by the NHTSA Fatal Accident Reporting Service ("FARS") and applied certain criteria to this data concluding that there were 26 other similar incidents like the accident involving Tunnell. Based on Wallingford's analysis of the FARS data, plaintiff seeks to argue that Ford knew or should have known that damaged wiring was the probable ignition source for post-collision fires in 26 single car, frontal impact fatal collisions of Ford cars between 1985 and 1999. Tunnell provided the FARS reports and other information on these prior accidents to the court, and after careful and tedious review of this information, the court finds that there is no reasonable basis for Wallingford's opinion. Therefore, it is recommended that Wallingford's opinion based on the FARS data as to other similar incidents be excluded as unreliable and not appropriately grounded in the facts of this case. To be sure, Wallingford's analysis of the FARS data culls single car accidents in which there was a fatal fire. But that is all one can tell from the FARS data. There is no way to glean from the FARS data alone any information as to the cause or source of the fire. Criteria 22 employed by Wallingford in this FARS analysis states that "[i]f an investigation reported a cause other than electrical, electrical was considered ruled out." Pl's Opp'n Ford's Daubert Mot. Exclude Test Wallingford at 29. The problem with such an analysis is that eighty percent (80%) of the FARS files selected by Wallingford say nothing whatsoever about the source of the fire. Thus, all anyone knows of these incidents is that a single car accident happened by striking an object in the front of the vehicle; someone was killed; and there was a fire in the vehicle. There is no way from the FARS data to know where or how the fire started; thus, there is no way to determine whether these fire related deaths were similar or not. In short, Wallingford's methodology is little more than a wet finger in the wind which does not bear up under careful scrutiny. Indeed, close review of the few files selected by Wallingford as being "similar" which contain detailed information describing the accident indicates that those accidents were not similar at all. See FARS # 33 (lawsuit alleges fuel system as defective); FARS # 159 (lawsuit alleges defect in dual fuel tank selector valve on Ford F–150 causing fuel spillage and vehicular fire and explosion); FARS # 274 (lawsuit claims no fuel pump electrical disconnect device); FARS # 360 and 454 (accident photos show fire in engine compartment of vehicle); FARS # 301 (accident report recites "vehicle was fully engulfed in fire (with thick black smoke)"). Even applying the lesser standard suggested by Tunnell for introduction of evidence of other similar incidents merely for the purpose of show-

ing notice, *Smith v. Ingersoll–Rand Co.,* 214 F.3d 1235, 1246–47 (10th Cir.2000), Wallingford's other similar incidents analysis fails.

In *Blevins v. New Holland,* 128 F.Supp.2d 952 (W.D.Va.2001), Judge Jones likewise concluded that other similar accident evidence be excluded, reasoning as follows:

> Evidence of similar accidents is not generally admissible for the purpose of proving negligence or causation. *See Roll 'R' Way Rinks, Inc. v. Smith,* 218 Va. 321, 237 S.E.2d 157, 160 (1977). Such evidence may be admissible, however, to show notice or actual knowledge by the defendant of a defect in its product. *See Gen. Motors Corp. v. Lupica,* 237 Va. 516, 379 S.E.2d 311, 314 (1989). While the prior accident involving Roger Hornsby may be relevant to show that New Holland was aware of the fact that operators of towed hay balers may leave their positions in spite of the risk of inquiry, I find that a balancing of interests dictates that such evidence be excluded pursuant to Federal Rules of Evidence 403. It is true that the similarity required is somewhat relaxed when offering prior accidents to prove notice of a dangerous condition rather than negligence, *see Benedi v. McNeil–P.P.C., Inc.,* 66 F.3d 1378, 1386 (4th cir.1995), but the court nevertheless maintains "broad discretion" to exclude evidence of prior incidents under rule 403. *See Brooks v. Chrysler Corp.,* 252 U.S.App. D.C. 29, 786 F.2d 1191, 1195 (D.C.Cir. 1986).
>
> Proof of prior accidents is not easily admitted into evidence because it often results in unfair prejudice, consumption of time, and distraction of the jury to collateral matters. *See* 786 F.2d at 1198.

*Blevins,* 128 F.Supp.2d at 960–961. Moreover, there is other evidence in the record that both Ford and the industry were well aware of the hazard of post-collision fires caused by electrical system component failure and malfunction. *See, e.g.,* National Highway Traffic Safety Administration, Motor Vehicle Safety Standards, Advance Notice of Proposed Rulemaking on Electrical System Integrity, Federal Register, Vol. 40, No. 172 (September 4, 1975); Ford's Amended Response to Request for Admissions 1, 2, 3, 4, 5, 11, 13, 14, 15, 16, 17; and documents and other evidence referenced in Wallingford's December 12, 2003 expert report. Because other evidence exists as to the issue of notice, the prejudice of the admission of Wallingford's other similar incidents testimony outweighs its probative value.

### CONCLUSION

For these reasons, it is recommended that the motions to exclude expert testimony of Dr. Pamela Kiecker and Dr. Marjorie Adams be overruled as the objections raised by Ford go to the weight to be attributed the evidence and not its admissibility, and questions of consumer expectations as regards battery disconnects are for the jury. Additionally, Kiecker and Adams fully meet the expert testimony requirements under Fed.R.Evid. 702, 703 and *Daubert.* Further, it is recommended that the motions to exclude fire origin experts Charles Crim and Samuel McKnight be overruled as they fully meet the expert testimony requirements under Fed.R.Evid. 702 and *Daubert.* Finally, it is recommended that Ford's motion to exclude Jerry Wallingford be granted in part and overruled in part. Wallingford may testify as to fire cause and origin; the feasibility and availability of battery disconnects in 1999; the design and installation of battery disconnect devices in an exemplar 1999 Mustang GT; that a 1999 Mustang GT lacking battery disconnect devices was unreasonably dangerous; and

that the absence of battery disconnect devices was the proximate cause of the fire as set forth in Opinions I, II, VIII and IX. As noted above, Wallingford may not render, as expert opinions, the opinions set forth in his Opinions III, IV, V, VI and VII. Certainly, the documentary and evidentiary support for these opinions, however, may be introduced into evidence independently or as background and support for Wallingford's other opinions under Fed.R.Evid. 703.

The Clerk is directed immediately to transmit the record in this case to the Hon. Norman K. Moon, United States District Judge. Both sides are reminded that pursuant to Rule 72(b) they are entitled to note any objections to this Report and Recommendation within ten (10) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as well as to the conclusions reached by the undersigned, may be construed by any reviewing court as a waiver of such objection.

The Clerk of the Court hereby is directed to send a certified copy of this Report and Recommendation to all counsel of record.

June 28, 2004.